JOY COSSICH LOBRANO, Judge.
11 Conell Galle and Allen Scott both appeal their convictions for attempted second-degree murder and possession of a firearm by a convicted felon. For reasons that follow, we affirm the convictions and sentences, but remand for imposition of fines under La. R.S. 14:95.1(B).
Pursuant to several 911 calls, at approximately 4:20 a.m. on March 21, 2009, Officer Juan Vara of the New Orleans Police Department (NOPD) and his Field Training Officer (FTO) were dispatched to the 2200 block of General Taylor Street. When he turned onto General Taylor Street, Officer Vara saw Thomas Williams standing in the street with blood covering most of his upper body from a gunshot wound to the neck. As he approached the residence at 2204 General Taylor Street, Officer Vara observed Nykeisha Jackson lying on the ground with a gunshot wound to her head and another one to her chest area. The victims described the perpetrators to Officer Vara only as two black males and, although Officer Vara spoke to neighbors, no eyewitnesses to the crime came forward. Shortly thereafter, Detective Nathan McGhee arrived to take charge of the investigation and the crime scene was processed. Both victims testified before the grand jury; Ms. Jackson testified that both Galle and Scott were involved in the 12attempt on her life, but Mr. Williams indicated that he and Galle were outside on the porch when someone else ran into the residence and shot Ms. Jackson, then charged out of the door and shot him in the neck.
On August 6, 2009, Galle and Scott were jointly charged by grand jury indictment. Both were charged with two counts each for the attempted second-degree murders of Mr. Williams and Ms. Jackson, as well as one count each for being a convicted felon in possession of a firearm. The defendants pleaded not guilty at their arraignment on August 12, 2009. On September 13, 2010, the State turned over Mr. Williams’ grand jury testimony to Galle’s defense counsel. Counsel for Galle filed a motion in limine alleging that Mr. Williams was unavailable to testify at trial, and seeking to have Mr. Williams’ grand jury testimony read into the record instead. On January 25, 2011, the trial court denied that motion and this Court denied Galle’s writ application seeking review of that decision, finding that he had an ade *920 quate remedy on appeal.[1] On March 4, 2011, the trial court denied a motion to sever offenses as to both defendants.
The matter went to trial on March 14, 2011. During the three-day trial before a twelve-person jury, the following evidence was adduced. Among the State’s witnesses were Ms. Jackson and the NOPD officers involved in the investigation. The State did not present Mr. Williams as a witness.
New Orleans Police Department Officer George Jackson was qualified by joint stipulation as an expert in the taking, examination, and comparison of fingerprints. Officer Jackson testified that he had taken defendant Scott’s fingerprints in court the previous day. He matched those known fingerprints of ^defendant Scott to fingerprints on an arrest register, a bill of information, and a plea of guilty form evidencing what the officer said was Scott’s 2006 conviction for illegal discharge of a firearm. Similarly, Officer Jackson testified that he had taken defendant Galle’s fingerprints in court the previous day. He matched those known fingerprints to documents evidencing Galle’s arrest and 2004 conviction for possession of cocaine.
The audio recordings of the 911 calls received in the early hours of March 21, 2009, two reporting gunshots and one reporting a person having been shot, were identified by Gesielle Roussel, the NOPD division supervisor and custodian of 911 audio recordings, and played for the jury. Ms. Roussel also identified the incident recall dated March 21, 2009, at approximately 4:28 a.m., from General Taylor and Loyola Streets, pertinent to the 911 calls and confirmed that at no point during any of the three calls was the alleged shooter identified.
Officer Vara testified as to his role in the events of March 21, 2009, stating that at approximately 4:20 a.m., he and his FTO were dispatched to the 2200 block of General Taylor Street as a result of 911 calls of gunshots. Upon turning onto General Taylor Street, Officer Vara saw the male later identified as Mi*. Williams standing in the street covered in blood from a gunshot wound to the neck. In addition, as he approached the residence at 2204 General Taylor Street, Officer Vara observed the female later determined to be Ms. Jackson lying on the ground with a gunshot wound to her head and another one to her chest area. Inside the residence, Officer Vara observed blood on all the walls except the middle bathroom. He identified photos of the scene, which were subsequently admitted into evidence. Officer Vara testified that the victims described the perpetrators to him only as two black males and, although he spoke to neighbors, none of them Lwitnessed the shootings.[2] Officer Vara related that he and his FTO brought Mr. Williams into the residence and sat him down on a couch inside to await medical assistance. A crack pipe and a push rod were found in the residence, but Officer Vara was unaware of any arrests being made in connection with those items. He did not recall any weapons or spent cartridge casings being found inside the residence.
On cross-examination, Officer Vara indicated that the shootings occurred in the middle bedroom, the room in which drug paraphernalia and money were found. He based this conclusion on a neighbor’s re *921 port of hearing gunshots fired in the center of the residence. Although Officer Vara was absent from the scene when it was processed, he confirmed that photographs of the middle bedroom showed a crack pipe and push rod, a ten-dollar bill and a five-dollar bill, a box of Arm & Hammer Baking Soda, and an open box of plastic sandwich bags. Officer Vara did not recall seeing a plastic bag inside a toilet, as depicted in a crime scene photograph, but stated that it could have been there at the time he was in the residence. When asked how blood had been spread throughout the residence, Officer Vara refreshed his recollection by referring to his police report and then stated that when Thomas Williams was shot in the neck, he ran into the back of the residence and then ran back to the front.
NOPD Crime Scene Technician Bessie Patrolia testified that she processed the crime scene and identified a copy of her report. She stated that although she took eleven blood samples from the crime scene, none were submitted for a laboratory exam nor (to her knowledge) were any DNA profiles generated from the |Bblood samples. She did not collect any latent fingerprints from the scene or from any object at the scene, specifically a twenty-dollar bill recovered; a crack pipe; or the metal push rod. To her knowledge, no ballistics report had been generated regarding the one spent bullet collected by her.
Bobby Dickerson testified that he was then in custody in Washington Parish with charges pending against him and had a 1991 conviction for possession of crack cocaine. He stated that he did not want to be in court that day, that he did not want to participate in the trial in any way, and that he did not want to answer any questions the prosecutor asked of him. After being declared a hostile witness on motion by the State, Dickerson denied knowing either defendant but referred to Mr. Williams as “Uncle.” Dickerson recalled meeting with Detective McGhee, the crime scene investigator, on the day of the incident and confirmed talking with him about what happened when Mr. Williams got shot, but insisted “they” coerced him to say those things. Dickerson confirmed that he and Mr. Williams had gone to Ms. Jackson’s residence to purchase drugs. He further confirmed that when they got to the residence, he stayed in the car while Mr. Williams went into the residence to meet with Jackson. When asked whether “Duke” (later identified as Galle) and somebody else subsequently showed up at the residence, Dickerson said he did not know. When asked immediately thereafter whether, after Duke and the other person showed up, Duke and Ms. Jackson talked for a second, Dickerson replied that he did not know what they talked about inside.
When asked whether he saw Duke take out a gun and hand it to the other person, Dickerson said he did not see that happen. When asked whether he saw or heard Duke tell the other person to “lay that bitch down,” Dickerson replied that he had not seen that, but had been coerced “to say all that what I just said in my first ] (¡statement.” When asked whether he had told Detective McGhee those things, Dickerson confirmed that he had, stating, “[h]e coerced me to say that.” Dickerson said he was on narcotics at the time. Dickerson denied seeing Jackson get shot in her head. He denied seeing the person who was with Duke shoot Mr. Williams in the neck. Dickerson stated that he left after the shooting but returned to the scene to check on Mr. Williams. After Mr. Williams and Ms. Jackson were taken to the hospital, Dickerson met with Detective McGhee and told him “all of these things.” He reiterated that he was coerced by the *922 detective into saying what he did in his statement.
On cross-examination, Dickerson stated that he was parked across the street from Jackson’s residence. He said the screen door on the residence was closed, and the porch light was off. It was around 4:00 a.m. or 5:00 a.m., and dark. Dickerson conceded he had been using drugs all night, “smoking and using heroin,” and confirmed that the whole night was a blur to him. He replied in the affirmative when asked whether the recorded statement Detective McGhee said Dickerson made to him had been coerced and influenced by the detective. According to Dickerson, the detective talked to him before the recorded statement was made so he would know what to say on the recorded statement.
On redirect examination, Dickerson stated that he heard shots that morning, but did not know from where they came. He confirmed that he saw Williams with a gunshot wound to his neck.
NOPD Detective Nathan McGhee testified that when he responded to the shooting at 2204 General Taylor Street on March 21, 2009, he met with the two initial responding officers, one of whom was Officer Vara. When he entered the residence he observed the first victim, Ms. Jackson, lying on the floor of the living 17room with a gunshot wound to her head, one to her abdomen, and one to her leg. She appeared to be very near death. He also observed Mr. Williams sitting on a sofa holding a towel to a gunshot wound to his neck, which was bleeding profusely. Detective McGhee developed a suspect, “Duke,” whom he later determined was defendant Galle. Detective McGhee testified that Mr. Williams was reluctant to say anything and provided no relevant information; he said Mr. Williams was just screaming for medical attention. Detective McGhee spoke to a witness named Freddie Davis, who told the detective he had been in the back of the residence when the shootings occurred. Davis did not witness the shootings; he only heard and saw one of the victims running to the rear of the residence.
Detective McGhee also spoke to Bobby Dickerson, who told him that he had observed a subject he knew as “Duke.” Detective McGhee said Dickerson was cooperative and that Dickerson knew both victims. Dickerson said that he had dealings with Ms. Jackson in the past. Dickerson worked with Mr. Williams and had come to the General Taylor Street residence in Mr. Williams’ vehicle. After Detective McGhee developed defendant Galle as a suspect, he included his photo in a six-photo lineup and displayed it to Bobby Dickerson on March 24, 2009. Detective McGhee said this was the second time he had contact with Dickerson, the first time being the morning of the shootings. Detective McGhee said Dickerson came to him, presumably to a police station, to make the identification. After Dickerson identified Galle, Detective McGhee prepared an arrest warrant for Galle. When asked whether he told Dickerson who to pick out of the photo lineup, Detective McGhee said he had not, noting that Dickerson knew the subject and had had dealings with him in the past.
| ^Detective McGhee testified that he met with Ms. Jackson on April 13, 2009, and showed her a photo lineup in which she identified defendant Galle who was known to her as “Duke.” Detective McGhee stated that he did not force, threaten or coerce Ms. Jackson into identifying Galle or promise or give her anything in exchange for identifying him as the individual who handed the gun off to the shooter. Detective McGhee testified that he also learned on that date that Ms. Jackson could identi *923 fy the individual who had fired the shots during the incident, although she did not know his name. She claimed to have been to that individual’s residence in the company of defendant Galle. Detective McGhee testified that when Ms. Jackson was well enough, he picked her up with the assistance of the District Attorney’s Office and brought her to a location where she pointed out an apartment in the Willowbrook Apartments where the shooter had been present. He later confirmed on cross-examination that this had occurred on July 29, 2009. At the apartment complex, Ms. Jackson described for the detective a female who lived in the apartment. Detective McGhee subsequently set up surveillance with another detective and observed the described female. He subsequently discovered that a male living in the apartment was defendant Scott. On August 3, 2009, Detective McGhee displayed a photo lineup to Ms. Jackson containing a photo of defendant Scott and she identified him as the shooter without Detective McGhee forcing, threatening, or coercing her, or promising or giving her anything in exchange. Detective McGhee identified the respective photo lineups shown to Ms. Jackson in which she identified defendants Galle and Scott. Detective McGhee testified that Ms. Jackson identified Scott as the shooter, the person to whom Conell “Duke” Galle had handed the gun. Detective McGhee identified Galle and Scott in court.
IflOn cross-examination, Detective McGhee testified that when he displayed the photo lineup containing defendant Galle’s photo to Ms. Jackson, he asked her if she recognized the person she knew as “Duke” in the lineup. The detective made no request for the testing of any blood samples because he had no information that either of the perpetrators had been injured. No testing was done on the bullet because, Detective McGhee said, police had no gun to link to the bullet. The detective confirmed that he met with Bobby Dickerson on three occasions: the day of the incident; the day following the incident; and on the date he displayed the photo identification to him. Detective McGhee said that Dickerson told him he and Mr. Williams stopped to purchase drugs on their way to work.
Under further cross-examination, Detective McGhee confirmed that Dickerson gave a description of one suspect as being 6'4_, weighing 180 pounds, while police reports in the case reflected that defendant Scott was 5'9_. Detective McGhee confirmed that there was no evidence connecting defendant Scott to the crime or to the crime scene except for the word of Ms. Jackson.
Warren Spears, the supervisor over property and evidence for the Office of the Clerk of Criminal District Court, testified that his job entailed maintaining evidence brought to the clerk’s office by law enforcement, primarily the NOPD. He detailed the procedure.
Ms. Jackson identified a previously-admitted photograph of the General Taylor Street residence in which she resided on March 21, 2009. She stated that in the early morning hours of March 21, 2009, she was drinking and indulging in drugs, having begun doing so the night before, around 9:00 p.m. A friend, Freddie Davis, who lived out of town, came over around 10:30 or 11:00 p.m. to spend the night in a spare bedroom. Davis brought a six-pack of beer with him, but he did 1 innot consume any drugs with Jackson. Someone from the neighborhood she knew as “Thomas” knocked on her front door around midnight or 1:00 a.m. Ms. Jackson opened her iron security door, let Mr. (Thomas) Williams inside, and told him to lock the door. Ms. Jackson testified that she had *924 already consumed drugs (she later stated that she had smoked crack cocaine earlier that day) and was no longer high, but was still drinking and was intoxicated.
Ms. Jackson said Mr. Williams related to her that he had seen Galle at a gas station earlier that day and that Galle had told him to come to her residence. Ms. Jackson knew Galle by the name “Duke” and she identified him in court. Ms. Jackson stated that she had known Galle for seven or eight months and that they had an on and off sexual relationship, but did not have a boyfriend/girlfriend relationship. She said Mr. Williams was seeking to purchase drugs from Galle. She telephoned Galle, who, upon being informed by Ms. Jackson that Mr. Williams was at her residence to purchase drugs, said: “Bitch, I already know that. Open up the door.” When Ms. Jackson opened her interior door and exterior security door, she saw defendants Galle and Scott. She stated that although she did not know defendant Scott’s name, he usually was with defendant Galle when she saw him and, in addition, she had spoken with Scott and been invited several times to “their” residence in Willowbrook Apartments in eastern New Orleans where she met Scott’s girlfriend.
According to Ms. Jackson, after defendants Galle and Scott entered her residence in the early morning hours of March 21, 2009, she was standing in the front room with the defendants and Mr. Williams. Freddie Davis was still .in the back bedroom. Ms. Jackson said she noticed that defendant Galle had rage in his eyes, questioning why Mr. Williams was in the house. She said Galle had a large Infirearm with a big drum (apparently meaning a large-capacity drum magazine) inserted into the firearm. Galle said to Mr. Williams: “Man, what the fuck you doing up in here?” Ms. Jackson said at that point to Galle: “What is he doing in here?” Ms. Jackson then said to Mr. Williams: “Didn’t you tell me that he said for you to come here?” Mr. Williams replied in the affirmative, trying to explain himself to defendant Galle. Ms. Jackson said that at that point she was furious, and stated: “Man, guess what? All y’all get the fuck up out my house.”
Ms. Jackson testified that defendant Galle then removed a handgun from his waist, passed it to Scott, and told Scott, “Lay the bitch down.” The next thing she knew, she was on the floor. She stated that she must have been out for a few seconds because she did not know what had happened. Unbeknownst to her at the time, she had been shot in the head. Her vision was blurred momentarily. When she regained it, Ms. Jackson observed Mr. Williams with blood spurting out of both sides of his neck. She said she did not remember being shot in the head or remember Mr. Williams being shot. She exclaimed: “Man, y’all done shot this nigger in my house.” At that point, defendant Galle said to defendant Scott: “The bitch ain’t dead. Man, this bitch ain’t dead. Shoot her again.” Ms. Jackson testified that defendant Scott then shot her in her chest, stomach, and one of her knees. She said she was still on the ground when that happened. Ms. Jackson said defendant Galle said to her: “See what you made me do, you bitch? You know I loved you.” Galle and Scott then left the residence.
Ms. Jackson detailed the serious extent of her injuries resulting from the gunshots. She identified the clothing she wore on the morning she was shot, including a new wig she had purchased with money given to her by defendant Galle, along with a new stocking cap she had been wearing underneath the wig. 1 ^She manipulated it to show a hole which she assumed must have *925 been a bullet hole because the stocking had been brand new. She was shot four times. Ms. Jackson said she had probably been to doctors thirty or forty times for treatment related to her injuries and had been in and out of the hospital. She went to a neurologist for her head and another physician for treatment of her stomach and gastrointestinal problems. She was shot in the chest and stomach, and still had a bullet lodged in her abdomen, resulting in gastrointestinal problems, including bowel obstructions. She testified that half of her intestines had been removed and her liver repaired, and that she had staples from the top of her breastbone to her navel. She still had bullet fragments in her left knee. She had to learn how to walk all over again, and used a walker for two months.
Ms. Jackson identified a crack pipe that had been in her pants pocket that night, and an accompanying metal push rod. She remembered Detective McGhee being on the scene and checking on her. She implored him not to let her die. Ms. Jackson replied in the affirmative when asked whether she believed she was going to die. When asked whether she remembered talking to anyone else that night, she said she just remembered asking and pleading for Detective McGhee not to leave her and not to let her die. Once she got out of the hospital, towards the end of March or beginning of April, 2009, she met with Detective McGhee at her residence. She told him about defendant Galle, but did not know defendant Scott’s name at the time. She identified defendant Galle, or “Duke,” in a photo lineup presented to her by Detective McGhee. She said defendant Galle was the person who told defendant Scott to shoot her. She later met with Detective McGhee in July, when he presented her with a photo lineup in which she selected a photograph of defendant Scott as the person who shot her.
11RMs. Jackson testified on cross-examination that she might have smoked four rocks of crack cocaine between 9:00 p.m. and 11:00 p.m. in the hours before the shootings, which occurred early the next morning. She confirmed that she had been drinking since approximately 3:00 p.m. or 4:00 p.m., having drunk two or three beers during an afternoon second-line parade and three beers from the six-pack that Freddie Davis had brought when he came over that night.
After deliberations, the jury found both defendants guilty as charged of the attempted second degree murder of Ms. Jackson, but not guilty as to the attempted second degree murder of Mr. Williams. In addition, both defendants were found guilty of being convicted felons in possession of a firearm.
On April 8, 2011, defendant Galle filed motions for post-verdict judgment of acquittal, new trial, and in arrest of judgment, all of which were denied. He waived sentencing delays and the trial court sentenced him on count one (attempted murder) to forty years at hard labor and on count three (possession of firearm) to ten years at hard labor, both sentences to be served consecutively and without benefit of parole, probation, or suspension of sentence.
Also on April 8, 2011, defendant Scott filed motions for post-verdict judgment of acquittal and new trial, both of which were denied. He waived sentencing delays and was also sentenced on count one (attempted murder) to forty years at hard labor and on count four (possession of firearm) to ten years at hard labor, both sentences to be served consecutively and without benefit of parole, probation, or suspension of sentence.
On August 19, 2011, defendant Galle was adjudicated a second-felony habitual of *926 fender, whereupon the trial court vacated his original sentence imposed as to count one (attempted murder) and resentenced him to one hundred years at 114hard labor, without benefit of parole, probation, or suspension of sentence. Also on August 19, 2011, in a separate hearing, defendant Scott was adjudicated a fourth-felony habitual offender, whereupon the trial court vacated his original sentence imposed as to count one (attempted murder) and resen-tenced him to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. The trial court ordered that the habitual offender sentences imposed on both defendants be served consecutively to their respective sentences imposed on their convictions for possession of a firearm by a convicted felon.
The defendants filed timely and separate appeals.
In his first assignment of error, Galle asserts that the trial court erred in denying his motion in limine to have Mr. Williams’ grand jury testimony read at trial. The State turned over Mr. Williams’ grand jury testimony to defense counsel prior to trial. The defense argued that Mr. Williams’ grand jury should be read to the jury at trial because Mr. Williams was unavailable to testify at trial and his grand jury testimony was exculpatory as to Galle.
At the grand jury proceeding, the version of the events at issue offered by Mr. Williams differed substantially from the version of events offered by Ms. Jackson in her testimony at trial. Mr. Williams told the grand jury that he saw Galle physically assault Ms. Jackson, but that after Galle hit Ms. Jackson, he came out on the front porch with Mr. Williams, and was still there when another man ran into the house. Mr. Williams said that, shortly thereafter, he heard gunshots fired inside of the house, and then the man who had run into the house while he and Galle were on the front porch came out and shot him. Nothing in Mr. Williams’ grand jury testimony implicated Galle in the shootings or in the possession of a weapon.
|1fiIn the motion in limine, defense counsel sought to have the relevant portion of Mr. Williams’ grand jury testimony introduced in his absence as a witness at trial pursuant to La. C.E. articles 804 and 403. The trial court denied the motion at a hearing on January 25, 2011. At that hearing, the State told the trial court that Mr. Williams was not going to be a witness at trial “as of right now,” but argued:
STATE: But the Grand Jury testimony is not permitted to be read aloud at trial. If Mr. Williams was here and [defense counsel] wanted to impeach him with that Grand Jury testimony, he could possibility do that. But he cannot simply read out the Grand Jury Testimony of Mr. Williams.
JUDGE: I agree with that.
Defense counsel argued that Mr. Williams’ grand jury testimony was admissible because it was sworn testimony given in response to a subpoena and the State “had ample opportunity to question him about this matter.” Further, defense counsel averred that despite ongoing “diligent efforts” to find him, Mr. Williams was unavailable as a witness. Defense counsel did not detail what efforts had been made to secure Mr. Williams’ presence at trial. In addition, defense counsel asserted that Mr. Williams’ grand jury testimony was exculpatory to Galle and implicated Galle’s Sixth Amendment right to present a meaningful defense.[3] Specifically, Galle argued *927 pursuant to La. C.E. article 804 that (1) the grand jury testimony was exculpatory in nature; (2) Mr. Williams was unavailable; and (8) the State had ample opportunity for direct examination of Mr. Williams at the grand jury proceeding.
11fiGrand jury testimony is generally clothed in secrecy,[4] but there are exceptions both statutory and jurisprudential. Specifically, the Louisiana Supreme Court established in State v. Peters, 406 So.2d 189, 191 (La.1981), that grand jury testimony is discoverable if it is favorable to the accused and is material to guilt or punishment under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and La.C.Cr.P. article 434 provides that grand jury testimony may be disclosed to show that a witness committed perjury in his testimony before the grand jury-
La. C.E. article 804 provides, in pertinent part:
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a party with a similar interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Testimony given in another proceeding by an expert witness in the form of opinions or inferences, however, is not admissible under this exception.
La. C.E. article 804(A)(5) provides that a declarant is “unavailable” as a witness when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court, and that this includes situations in which the declarant:
Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or 117wrong-doing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.
As a general rule, an absent witness’ prior testimony may be presented at trial if the party relying on the testimony can prove that the witness is unavailable. State v. Randall, 2002-0248, p. 7 (La.App. 4 Cir. 10/16/02), 830 So.2d 1062,1067. Defense counsel stated at the January 25, 2011 hearing that “diligent efforts” had been made to locate Mr. Williams, but that those efforts had been unsuccessful.[5] De- *928 fense counsel did not detail what those efforts included, and stated only that Mr. Williams had moved from a previous address and left no forwarding address, and that an investigator “is still looking for him.” Furthermore, defense counsel did not offer any other information in pleadings in support of the claim that Mr. Williams was unavailable to testify at trial.
A review of the record, including the transcript of the January 25, 2011 hearing, shows that Galle did not carry his burden of proving that Mr. Williams was, in fact, unavailable to testify at trial. As such, the trial court did not abuse its discretion in denying Galle’s motion in limine to have Mr. Williams’ grand jury testimony read at trial. As for Galle’s argument that the trial court’s denial of the motion in limine prevented him from exercising his Sixth Amendment right to present a meaningful defense, the trial court considered that argument at the January 25, 2011 hearing, but rejected it when she denied Galle’s request to introduce the transcribed grand jury testimony of Mr. Williams. We find no error in the trial court’s ruling.
|1RIn Galle’s second assignment of error, relative to the grand jury testimony of Mr. Williams, he argues that “the prosecutor breached an ethical obligation to pursue truth as opposed to obtaining a conviction when, although providing Brady material, she obstructed the defense efforts to utilize what had been given.” Given our conclusion that the trial court properly denied the defendant’s motion in limine to introduce the transcript of Mr. Williams’ grand jury testimony at trial, we find no merit in this argument.
In his third assignment of error, Galle argues that the trial court erred in denying his motion to sever the count charging him with possession of a firearm by a convicted felon from the count charging him with attempted second degree murder. This argument was also raised by defendant Scott in his first assignment of error.
Two or more offenses may be charged in the same indictment in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan, provided that the offense joined must be triable by the same mode of trial. La.C.Cr.P. article 493. If it appears that a defendant is prejudiced by the joinder of offenses in an indictment or bill of information, a court may grant a severance of offenses. La.C.Cr.P. article 495.1. A defendant bears a heavy burden of proving prejudicial joinder of offenses and must make a clear showing of prejudice. State v. Lomax, 2009-1129, p. 9 (La.App. 4 Cir. 3/24/10), 35 So.3d 396, 401. A motion to sever is addressed to the sound discretion of the trial court, and the court’s ruling should not be disturbed on appeal absent a showing of an abuse of discretion. State v. Demise, 98-0541, p. 7 (La.4/3/01), 802 So.2d 1224,1232.
| ^Defendants both contend that the charging of the firearm violations in the indictment served no other purpose than to place before the jury evidence of other crimes, which evidence would not ordinarily be admissible. They submit that the other crimes evidence prejudiced them and could only have been used by the jury to infer a criminal disposition.
The offenses were properly joined under La.C.Cr.P. article 493 because they were based on the same act or transaction. The firearms charges and the attempted second degree murder charges were clearly distinct such that the jury should not have been confused by the various counts and would have been able to segregate the *929 charges and evidence as to both defendants. There is no evidence that the defendants were confounded in presenting a defense by the joinder for trial of the firearms charges with the attempted murder charges. The defendants were charged with two counts of attempted second degree murder, and the evidence was that these offenses were committed through the misuse of a firearm. The jury heard disturbing evidence as to both of the defendants’ roles in the shootings of Ms. Jackson and Mr. Williams. Because of that, we find no merit in the argument that because the jury additionally heard that both men had prior felony convictions, this fact would make the jury “hostile” toward them.
Defendant Scott also argues on appeal that the jurors were confused, as evidenced by the jury submitting a written request to the court during deliberations for a “sheet explaining the [responsive] verdicts” for the offenses charged — guilty only. In the request, the jury stated that it did not feel comfortable receiving the information in the courtroom, apparently meaning receiving those definitions orally and having to remember them. However, this request likely evidenced that one or more of the jurors wished to view and consider, in writing, the elements of | anthe offenses forming the responsive guilty verdicts — not a jury confused because of the inclusion of the firearms charges. The charges of attempted murder and possession of a firearm by a convicted felon are readily distinguishable from each other.
In connection with this argument, Scott also argues that his prior felony conviction used by the State to prove the firearms offense was a plea of guilty to five counts of illegal discharge of a firearm. That plea of guilty actually was to five counts of illegal use of a weapon; however, at trial, when the prosecutor asked the police officer who matched Scott’s known fingerprints to those on the bill of information for the prior offense what that prior offense was, the officer replied: “illegal discharge of a firearm.”
Scott submits that the only possible reason the State used this prior conviction was to depict him as a criminal, representing that the State had several other of his prior criminal convictions within the same time frame that it could have chosen from had the intent been to simply prove a prior conviction. He also asserts that the State needed only one prior conviction, not five.
However, the general rule is that the State is entitled to prove its case by evidence of its own choice. Lomax, 2009-1129, p. 12, 35 So.3d at 403. Further, while defendant Scott does not specifically point to any particular other prior conviction the State could have used to prove he was a felon in possession of a firearm, after conviction and sentencing in the instant case, Scott was adjudicated a fourth-felony habitual offender based on his instant conviction for attempted second-degree murder; the prior conviction for five counts of illegal use of a weapon; a prior conviction for armed robbery; and prior convictions from the same date for attempted distribution of marijuana and attempted possession with intent |21to distribute marijuana. That the State did not choose the attempted distribution/possession with intent to distribute marijuana convictions to prove at trial that he was a convicted felon in possession of a firearm does not necessarily evidence an intent to depict defendant as a criminal. Further, Scott complains of the use of the five counts of illegal discharge of a weapon, in part, because the State only needed one prior conviction to prove he was a convicted felon in possession of a firearm. By this reasoning, the two drug convictions would be out as acceptable evidence at *930 trial as proof of his status as a convicted felon in ■ possession of a firearm. That would leave the prior armed robbery conviction, and it is highly doubtful Scott would have wanted that prior conviction used either.
Thus, considering the totality of the circumstances, the trial court did not abuse its discretion in finding that the defendant failed to prove that he was entitled to a severance of the firearm and attempted murder charges. There is no merit to this assignment of error.
In Galle’s fourth assignment of error, he argues that the evidence was insufficient to support his conviction for being a convicted felon in possession of a firearm and his adjudication as a second-felony habitual offender — in both instances due to the absence of sufficient proof that he was the same individual previously convicted of the specific prior felony offense alleged. The sole issue in this assignment of error is the sufficiency of the proof that defendant Co-nell Galle was the same Conell Galle who, on July 16, 2004, pleaded guilty to the felony offense of possession of crack cocaine. Proof beyond a reasonable doubt that the defendant has a prior felony conviction is a necessary element for conviction under La. R.S. 14:95.1 for possession of a firearm by person who previously has been convicted of an enumerated felony.
I22T0 obtain a habitual offender conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony. State v. Payton, 2000-2899, p. 6 (La.3/15/02), 810 So.2d 1127, 1130, citing State v. Neville, 96-0137 (La.App. 4 Cir. 5/21/97), 695 So.2d 534, 538-39. The court in Payton stated that in attempting to establish identity, the State may present:
(1) testimony from witnesses; (2) expert opinion regarding the fingerprints of the defendant when compared with those in the prior record; (3) photographs in the duly authenticated record; or (4) evidence of identical drivers [sic] license number, sex, race and date of birth. (Emphasis added).
Payton, 2000-2899, p. 6, 810 So.2d at 1130-31.
The court in Payton cited State v. West-brook, 392 So.2d 1043 (La.1980), where it had held in a second offense driving while intoxicated case that a driver’s license number, sex, race, and birth date all identified the prior offender as the defendant, and thus that the State proved the defendant’s identity as the same person previously convicted. Thus, not only are fingerprints on the bill of information not necessary to establish that a defendant charged as a habitual offender is the same person previously convicted, fingerprints are not absolutely required to prove identity. In Payton, however, as in the instant case, the New Orleans Police Department fingerprint expert matched the defendant’s fingerprints to fingerprints on the back of an arrest register for the prior conviction. The Louisiana Supreme Court held that this was sufficient proof of identity.
This result is in accord with previous decisions by this Court finding that the matching of a defendant’s fingerprints to fingerprints on an arrest register, and the linking of that arrest register to other documents evidencing a conviction is sufficient to establish that the defendant is the same person previously convicted. See State v. Francois, 2002-2056 (La.App. 4 Cir. 9/14/04), 884 So.2d 658; State v. Wolfe, 99-0389 (La.App. 4 Cir. 4/19/00), 761 So.2d 596; State v. Hawthorne, 580 So.2d 1131 (La.App. 4 Cir.1991); State v. Armstead, 542 So.2d 28 (La.App. 4 Cir.1989).
In the instant case, the State introduced various documents relative to defen *931 dant Conell Galle through the testimony of New Orleans Police Officer George Jackson, who was qualified through stipulation by both defendants as an expert in the taking, examination, and comparison of fingerprints. Officer Jackson first identified State Exhibit 5, a set of inked fingerprints he had taken from Galle in court the previous day. Officer Jackson also identified Galle in court. The officer identified State Exhibit 6, a certified copy of an Orleans Parish Criminal Sheriffs Officer arrest register reflecting a January 17, 2004 arrest of Conell Galle on a charge of possession with intent to distribute three pieces of crack cocaine. Officer Jackson testified that he was one of the custodians of that arrest register, kept on file with the New Orleans Police Department. That arrest register had finger and palm prints on the back of it. Officer Jackson testified that he had compared the right index finger of the set of fingerprints he had taken from Galle the previous day with the right index finger of the set of prints on the back of the arrest register, and concluded, in his expert opinion, that both had been placed by the same person.
Officer Jackson next considered State Exhibit 7, which he identified as a “cert, pack.” He confirmed that the cert, pack contained a certified arrest register that matched State Exhibit 6, except it had no fingerprints on it. Officer Jackson next identified a certified copy of a waiver of constitutional rights/plea of guilty form, part of State Exhibit 7, which evidenced a plea of guilty by Conell Galle in Incase #445-116 to [simple] possession of crack cocaine. When asked whether he had any doubt that the person he fingerprinted in State Exhibit 5 was one and the same person who pleaded guilty to possession of crack in State Exhibit 7, Officer Jackson replied: “No, ma’am. They’re one and the same person.”
In addition to Officer Jackson’s testimony concerning the documents in State Exhibit 7, that cert, pack contained a certified copy of a January 28, 2004 bill of information, in case #445-116, charging Conell Galle, of 2107 Soniat Street, New Orleans, Louisiana, with unlawfully possessing crack cocaine on January 17, 2004 — the same date the Conell Galle listed on the arrest register was arrested for possession with intent to distribute three pieces of crack cocaine. The Conell Galle listed on the arrest register had an address of 2107 Soniat Street, New Orleans, Louisiana, the same address listed for Conell Galle on the face of the bill of information. The waiver of rights/plea of guilty form evidencing a plea of guilty by Conell Galle on July 16, 2004, reflects case #445-116, the same case number listed on the bill of information.
The face sheet of the bill of information shows number “432124” next to the case number. A certified copy of an Orleans Parish Criminal District Court docket master in case #445-116, listing defendant Conell Galle, shows Magistrate Court # M^t32124, the same numerical number listed on the face of the bill of information. The docket master in case # 445-116 lists Conell Galle’s date of birth as 6/11/82, the same birth date listed on: (1) the waiver of rights/plea of guilty form for the Conell Galle who pleaded guilty on July 16, 2004, to possession of crack in case #445-116; and (2) the arrest register for the Conell Galle arrested on January 17, 2004 for possession with intent to distribute crack. The docket master in case # 445-116 reflects that Conell Galle pleaded guilty on July 16, 2004 to possession of | ^crack. A certified copy of a July 16, 2004 Orleans Criminal District Court minute entry in case #445-116 reflects that Conell Galle pleaded guilty on that date to possession of crack.
*932 The evidence detailed above links the arrest register for the Conell Galle arrested on January 17, 2004 for possession with intent to distribute crack — which arrest register was linked to the Conell Galle in the instant case by fingerprint comparison — to the other documentation, in a chain fashion, to establish beyond a reasonable doubt that the Conell Galle who pleaded guilty to possession of crack on July 16, 2004, in case # 445-116, was the same Conell Galle in the instant case.
Defendant makes much of the fact that the arrest register contained in the cert, pack had no fingerprints on it, unlike the arrest register with prints on the back used for comparison by Officer Jackson to the fingerprints he took from Galle in court the day before the officer testified. However, that is irrelevant, because the arrest register with the fingerprints on the back of it is linked to the other documents in the cert, pack evidencing the prior conviction in a chain fashion, through defendant’s date of birth, his address, the date of the arrest, the case number, the magistrate court number, etc. The cert, pack could be lacking any copy of an arrest register, yet the arrest register with the fingerprints on the back, together with the documents in the cert, pack would be sufficient proof beyond a reasonable doubt that defendant Conell Galle was the same Co-nell Galle who pleaded guilty to possession of crack cocaine on July 16, 2004. Moreover, the faces of the two arrest registers are identical in every respect — except the one with the fingerprints on the back is officially designated “Fingerprints Copy,” while the one in the cert, pack is officially designated “Magistrate Court Copy.”
12(jDefendant notes that the fingerprints taken by Officer Jackson were not compared by the officer to two fingerprints on the copy of the face of the January 28, 2004 bill of information. Defendant notes that the bill of information contains only the name and address of a person identified as Conell Galle, with no date of birth, no social security number, no driver’s license number and no photo. Defendant also notes that the charge in the bill of information, possession of crack, is different than the charge for which the Conell Galle listed in the arrest register was arrested, possession with intent to distribute crack. However, the name is the same in the bill of information and the arrest register. The address of Conell Galle is the same in both documents. Both offenses are for possessing, in some manner, crack, with the offense defendant was actually charged with being a lesser grade charge of the one he was arrested for.
As previously noted, the bill of information contains a case number, #445-116, that matches the case number on an Orleans Parish Criminal District Court docket master reflecting a charge against Co-nell Galle for possession of cocaine; the bill of information contains another number, “432124,” that corresponds to the magistrate court number on the docket master, “M-432124.” The docket master shows a date of birth for Conell Galle as 6/11/82, the same date of birth listed on Conell Galle’s arrest register. The waiver of constitutional rights/plea of guilty form contains Conell Galle’s birthdate, 6/11/82, connecting it to the arrest register, and it contains the same case number as on the bill of information, # 445-116.
Possession of cocaine, crack or powder form, is a violation of La. R.S. 40:967(0(2), which provides for, and provided for at the time of defendant Galle’s arrest and conviction in 2004, a sentence upon conviction of imprisonment with or without hard labor for not more than five years. A “felony” is defined by La. R.S. | g714:2(4) as any crime for which an offender may be sen *933 tenced to death or imprisonment at hard labor.
Viewing all this evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant Conell Galle in the instant case was the same Conell Galle who pleaded guilty to the felony offense of possession of crack cocaine in case # 445-116 on July 16, 2004.
At defendant Galle’s August 19, 2011 habitual offender hearing, New Orleans Police Officer Joseph Pollard was qualified by stipulation as an expert in the taking, examination, comparison, and analyzing of fingerprints. Officer Pollard also was one of the custodians of records for the NOPD. He testified that he had taken fingerprints from defendant Galle in court that day, identifying the fingerprint card, State Exhibit 1. Officer Pollard compared the right middle fingerprint on State Exhibit 1 to the right middle fingerprint on the back of State Exhibit 2, which he identified as a certified copy of an arrest register — for Conell Galle, reflecting a January 17, 2004 arrest for possession with intent to distribute three small pieces of crack cocaine. Officer Pollard confirmed that in his expert opinion the same person who placed his fingerprints on State Exhibit 1 was the same person who placed the fingerprints on State Exhibit 2.
Officer Pollard next identified State Exhibit 3 as a “certified pack” under case #445-116. This “cert, pack” contained certified copies of the same original documents that certified copies of which were introduced by the State as a cert, pack at trial to prove that defendant Galle was the same person who pleaded guilty on July 16, 2004 to possession of crack, a felony. In addition, unlike the cert, pack introduced at trial, this cert, pack contained a certified copy of a District Attorney’s |2SOffice screening form in case # 445-116, showing that the State accepted a charge against Conell Galle, with a date of birth of 6/11/1982, and an address of 2107 Soniat Street, New Orleans, Louisiana, for prosecution of possession of crack, with the original arrest charge from the date of arrest, January 17, 2004, being possession with intent to distribute crack, which charge was refused/diverted.
Defendant states that the District Attorney’s Office screening form that was part of the cert, pack at the habitual offender proceeding contained a “B of I No.” that did not correspond to the one on the arrest register. Defendant is correct as to that. However, all of the documents introduced at the habitual offender hearing, linked together by identifying factors such as Galle was the same Conell Galle who pleaded guilty on July 16, 2004, to possession of crack cocaine, a felony offense.
Therefore, the trial court properly found defendant Galle to be a second-felony habitual offender.
There is no merit to this assignment of error.
In defendant Galle’s fifth assignment of error, he complains that the trial court erred in denying his and defendant Scott’s motion to declare La.C.Cr.P. art. 782 and La. Const, art. 1, § 17 unconstitutional in that they authorize non-unanimous jury verdicts. Defendant Scott also raises this as his third assignment of error. Both defendants argued in the trial court and on appeal that such a practice violates their rights under the Fourteenth Amendment’s Equal Protection Clause.
Both defendants acknowledge that the Louisiana Supreme Court and this Court have consistently rejected this argument, but both are raising it now to protect their rights to further review of the issue should the state of the jurisprudence change. See State v. Bertrand, 2008-2215, p. 8 *934 (La.3/17/09), 6 So.3d 738, 743 (“Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments.”); State v. Rubens, 2010-1114, p. 30 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 50-51, writ denied, 2012-0374 (La.5/25/12), 90 So.3d 410 (quoting and following Bertrand on this issue); State v. Boudreaux, 2008-1504, p. 38 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, 1165, writ denied, 2010-2434 (La.4/8/11), 61 So.3d 682 (quoting and following Bertrand on this issue).
There is no merit to this assignment of error.
In his final assignment of error, defendant Galle correctly notes that a minute entry for his habitual offender proceeding incorrectly reflects that the State introduced six documents to establish his habitual offender status, “the same exhibits listed as those introduced against Mr. Scott.”
Separate docket master and minute entries for August 19, 2011 mistakenly reflect that the State introduced six exhibits at Galle’s habitual offender proceeding, and six exhibits at Scott’s habitual offender proceeding. The State introduced three exhibits at Galle’s habitual offender proceeding and six exhibits at Scott’s. The minute entry, in particular, specifically refers to identical case numbers for the three cert, packs purportedly introduced as to each defendant as State Exhibits 3, 5, and 6. However, those three cert, packs are for Scott’s three prior convictions. In addition, the listed State Exhibits 1 and 4 are both fingerprint cards. Two fingerprint cards were introduced at Scott’s habitual offender | ^proceeding, but only one fingerprint card was introduced at Galle’s habitual proceeding. It is apparent that all six of the state exhibits listed in both the docket master entry and the minute entry as having been introduced as to both defendant Galle and defendant Scott only related to defendant Scott.
Galle correctly notes that his habitual offender hearing transcript reflects that only three exhibits were introduced by the State at his habitual offender hearing; he correctly notes the rule that in the case of a conflict between the minutes and the transcript, the transcript prevails; and he prays that “[t]he minutes and docket master should be ordered corrected.” However, as he also notes, in cases where there is a discrepancy between a minute entry and the transcript (and, logically, between a docket master entry and the transcript), the transcript prevails. State v. Randall, 2010-1027, p. 3 (La.App. 4 Cir. 6/22/11), 69 So.3d 683, 685, writ denied, 2011-1560 (La.1/13/12), 77 So.3d 952; State v. Wells, 2010-1338, p. 9 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 308.
The record contains the sentencing transcript, reflecting that only three exhibits were introduced at defendant Galle’s habitual offender hearing. The record further reflects that the case number of the cert, pack that was referred to and presumably introduced at Galle’s hearing corresponds to the case number of the cert, pack that is contained in the record that was reviewed by this Court when considering defendant Galle’s assignment of error questioning the proof of his prior conviction. Thus, the record being complete, with the transcript of defendant Galle’s habitual offender hearing accurately reflecting the three exhibits introduced at the hearing, there is *935 no need to remand the case for correction of the docket master and minute entries.
|31As for Scott’s appeal, we first note that his first and third assignments of error have been already addressed above. Scott also argues that the evidence is insufficient to sustain either of his convictions. Pursuant to Jackson v. Virginia, 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). Absent internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the trier of fact, is sufficient to support a factual conclusión. State v. Marshall, 2004-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369.
Attempted second degree murder requires proof of a specific intent to kill. State v. Bishop, 2001-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Id. Specific intent can be formed in an instant. State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390. To obtain a conviction for attempted second degree murder, the State must prove the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim’s death. Bishop, supra. When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, supra. State v. Everett, 2011-0714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619.
Scott’s sole argument as to the sufficiency of the evidence for his conviction for attempted second degree murder is that the evidence was insufficient to establish that he was the individual who shot Ms. Jackson. He argues that the State |32did not negate the reasonable probability of misidentification because Ms. Jackson was high on crack and alcohol when she was shot. In addition, he suggests that Ms. Jackson’s memory was faulty because of the ordeal and her injuries.
Scott’s argument goes to Ms. Jackson’s credibility, not to the sufficiency of the evidence. Under Jackson v. Virginia, supra, an appellate court is not called upon, in reviewing the evidence for sufficiency, to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence but whether, viewed in the light most favorable to the prosecution, there is sufficient evidence to support the conviction. Ms. Jackson admitted that she was intoxicated at the time of the incident. However, she testified that she had been involved with Galle over a period of seven or eight months prior to the shooting and during that time Scott was often in his company. Moreover, she had been to Scott’s apartment several times. Accordingly, this was not a case involving a shooting -victim being shot by a stranger and mistakenly identifying him; she knew Scott well enough to recognize him on March 21, 2009.
Scott also attacks Ms. Jackson’s credibility because she denied selling drugs, testifying instead that Mr. Williams came to her home to purchase drugs from Galle. Scott submits that evidence of drug trafficking seized and/or photographed in her home included plastic baggies, a box of Arm & Hammer baking soda, a crack pipe, and a push rod. Scott also represents that “scales” were found in the residence, but does not cite any place in the record where that fact is mentioned. He also notes that the residence had two stoves/ranges, one *936 in the kitchen and one in a room that also contained a toilet and had items stored in it, averring that the second stove was present because a stove is a necessary appliance for cooking cocaine down into common street form. He argues that the evidence of two stoves ⅛⅛ consistent with Ms. Jackson being a seller of drugs and, thus, her testimony is not credible because she allegedly lied on cross-examination when she denied that she sold narcotics. Again, this issue goes to Jackson’s credibility, which is not at issue on review for sufficiency.
Scott does not dispute that Ms. Jackson knew Galle or attack her testimony as to having an intimate relationship with Galle for seven or eight months. He suggests, however, that her testimony that he was in Galle’s company eighty-five percent of the time she spent with Galle was implausible because it would be unusual for Galle’s friend to be around so much when Galle and Ms. Jackson were engaged in a primarily sexual relationship. Scott also characterizes as implausible Ms. Jackson’s testimony that she did not know Scott’s name, or at least a nickname, considering the amount of time she claimed to have spent around him and her claim that she had visited Scott’s apartment. Accordingly, Scott claims that Ms. Jackson was either lying about the amount of time she was around “Galle’s friend” in an attempt to bolster her identification of Scott or she lied about the relationship between her and Galle. Scott theorizes that Ms. Jackson wished to implicate Galle more than he was already implicated and she knew Galle would look guiltier if she could also pin the shooting on one of his friends. However, a reviewing court is not called upon to assess the constitutional sufficiency of the evidence by considering and discussing such speculative propositions that have no evidentiary basis and that concern the credibility of a witness.
Finally, Scott asserts that the only conclusive evidence presented at trial pertinent to his culpability was that Ms. Jackson knew where he lived, and that such knowledge does not constitute proof of attempted murder. However, this assertion is refuted by the record. Detective McGhee testified that Ms. Jackson ^identified Galle in a photo lineup while she was in the hospital and subsequently drove with him to the Willowbrook apartments and she pointed out the apartment where the shooter, whom she only knew as Galle’s friend, resided. Based on Ms. Jackson’s description of the female who she had seen at the apartment, Detective McGhee and another detective set up surveillance. Eventually they observed the female described by Ms. Jackson and learned that the male who resided in the apartment with that female was Scott. Accordingly,. Detective McGhee compiled a photo lineup and Ms. Jackson identified Scott’s photo as a photo of the person who shot her. This course of events does not suggest that Ms. Jackson was either mistaken in her identification of Scott as the person who shot her or that she connived to frame him.
Scott correctly states that Dickerson described the height of the shooter at 6'4" tall and 180 pounds, whereas Detective McGhee confirmed that Scott’s booking information listed him as 5'9" tall and 165 pounds. However, Dickerson was across the street from the residence in Mr. Williams’ car when the events occurred. We also note that the application for an arrest warrant for Galle, which was admitted into evidence and published to the jury, expressly without objection by either defendant, stated that “the witness,” meaning Dickerson, stated that “Duke” was 5'7" tall, weighing 300 pounds. It is *937 not unreasonable to infer that a person viewing someone 5'9" tall and 165 pounds in the company of a shorter person weighing 300 pounds might perceive the taller person as taller than he actually is.
Scott correctly states that a 911 caller reporting gunshots in the 2200 block of General Taylor Street stated that he heard four gunshots, and “one response.” He argues that this is inconsistent with Ms. Jackson’s sequence of the shootings, |,¾which was that she saw a gun and the next thing she knew she was on the floor, basically coming to after having been shot in the head; that she then saw blood spurting from Mr. Williams’s neck; that she then yelled at Galle; that Galle told Scott she was not dead and to shoot her again; and that Scott then shot her three more times. Scott notes that Jackson’s sequence of events has two shots in relatively close sequence, followed by a pause, and then three more shots. We note that the application for Galle’s arrest warrant recites that “the witness” (Dickerson) stated that the shooter, who had been handed a handgun by “Duke,” fired “about” five shots into Jackson as she fell to the floor, and then, as “Duke” and the shooter fled the residence, shot the witness’s friend (Mr. Williams) in the neck.
Although Ms. Jackson’s testimony seemingly conflicts with the 911 caller who reported four shots followed by a responding shot, as well as Dickerson’s description of the shooter, it was not internally contradictory or in irreconcilable conflict with the physical evidence. The 911 caller and Dickerson could have been mistaken in their version of events and, in any event, the factfinder determines witness credibility and the weight of the evidence. In this case, the jury clearly found Ms. Jackson’s testimony credible and gave it greater weight than Dickerson’s testimony or the version of events reported by the 911 caller. Accordingly, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Scott shot Ms. Jackson four times with the specific intent to kill her.
Scott’s sole argument as to the sufficiency of the evidence for his conviction for possession of firearm by a convicted felon is that because the State failed to prove the attempted second degree charge murder, “it necessarily would follow that they failed to prove the possession of a firearm” by him. Given that the | -¡^evidence is sufficient to sustain Scott’s conviction for attempted second degree murder, using a firearm, there is no merit to this argument.
Finally, we note that a review of the record reveals a patent error with regard to the sentences imposed on Galle and Scott for the convictions for possession of a firearm by a convicted felon. Pursuant to La.Rev.Stat. 14:95.1(B), a person convicted of possessing a firearm, having been previously convicted of an enumerated felony, “shall be imprisoned ... and be fined not less than one thousand dollars or more than five thousand dollars.” The sentencing transcript and the minute entry reflect that both defendants were sentenced to ten years at hard labor, without benefit of parole, probation, or suspension of sentence, for their convictions for possession of a firearm by a convicted felon. No fine was imposed on either defendant, and this court holds that in such event, the case must be remanded for imposition of the fine. State v. Stephens, 2009-0631, p. 10 (La.App. 4 Cir. 11/24/09), 27 So.3d 987, 993. Accordingly, this case must be remanded for imposition of the fíne upon defendants Galle and Scott for their convictions for violating La. R.S. 14:95.1.
For the foregoing reasons, we affirm the convictions and sentences of defendants *938 Galle and Scott, and remand only for imposition of fines as provided for by La. R.S. 14:95.1(B).
GALLE’S CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR IMPOSITION OF FINE; SCOTT’S CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR IMPOSITION OF FINE
LOMBARD, J., dissents in part.

. State v. Galle, unpub., 2011-0265 (La.App. 4 Cir. 2/25/11), writ denied, 2011-0441 (La.3/11/11), 60 So.3d 1237.

. Officer Vara confirmed on cross-examination that he was not aware of any other information as to the identity of the perpetrators being given to anyone at the scene.

. After the trial court denied Galle’s motion in limine to introduce Mr. Williams' grand jury testimony, defense counsel for Scott orally requested to join in Galle’s motion and *927 expand it to include the taped statements of the two witnesses (presumably Mr. Williams and Ms. Jackson) as well as their grand jury testimony. The trial court denied the motion, stating that counsel’s request went beyond that of the motion, suggesting that counsel file her own motion on behalf of Scott. There is no such motion in the record and this issue is not raised in Scott’s brief.

. See La. Const, article 5, § 34(A) (providing for the establishment of one or more grand juries in each parish and mandating that the secrecy of grand jury proceedings shall be provided by law); La.C.Cr.P. article 434 (mandating the secrecy of grand jury proceedings)

. Galle argues that the trial court ordered the State to provide the defense with Mr. Williams’ contact information at a hearing on October 26, 2010, but there is nothing in the record showing that such an order was issued.