MAX N. TOBIAS, JR., Judge.
hThe defendants, Jason M. Roe (“Roe”) and Joshua A. Watson (“Watson”) appeal their convictions for armed robbery with a firearm (Count 1). Roe alone appeals his conviction for armed robbery with a firearm (Count 2); possession of a firearm by a convicted felon (Count 3); and illegal possession of a stolen firearm (Count 4).
Finding no merit to any of Roe’s or Watson’s assignments of error as to their convictions on Count 1, but finding an error patent as to the sentence imposed on each of them for their convictions on this count, the convictions on Count 1 are affirmed, but their sentences as to this count only are vacated, and the case IS remanded for resentencing pursuant to La. R.S. 14:64 and La. R.S. 64.3 A. Finding no merit to any of Roe’s assignments of error as to Counts 3 and 4, but finding an error patent as to Count 3 only, Roe’s convictions and sentences as to those two counts are affirmed, but the case is remanded to trial court for the imposition of the mandatory fine for Count 3 only as provided for by La. R.S. 14:95.1 B. Finding that the evidence is insufficient to sustain Roe’s conviction as to Count 2, his conviction and sentence as to Count 2 are reversed. -
Ji-

STATEMENT OF THE CASE

Roe and Watson were jointly charged by bill of information on 19 July 2011: in Count 1 they were charged with armed robbery while armed with a firearm, violations of La. R.S. 14:64 and R.S. 14:64.3. Roe alone was charged: in Count 2 with armed robbery while armed with a firearm, violations of La. R.S. 14:64 and R.S. 14:64.3; in Count 3 with possession of a firearm, having been previously convicted of a felony, a violation of La. R.S. 14:95.1; and in Count 4 with illegal possession of a stolen firearm, a violation of La. R.S. 14:69.1.
Both defendants entered pleas of not guilty to all charges at their 25 July 2011 arraignment. The trial court denied their motion to sever the offenses. A twelve-person jury found Roe guilty on all four counts and Watson guilty on Count l.[1] The trial court denied the defendants’ respective motions for new trial and for post-verdict judgment of acquittal, and on that same date sentenced Roe as to: Counts 1 and 2, seventy years at hard labor on each; Count 3, fifteen years at hard labor; and Count 4, five years at hard labor. The trial court stipulated that all sentences were to be served without benefit of pa *843 role, probation, or suspension of sentence, and to run concurrently. The trial court sentenced Watson as to Count 1 to fifty years at hard labor, without benefit of parole, probation, or suspension of sentence. The trial court denied on that day motions filed by both defendants to reconsider their respective sentences. These timely appeals followed.
II.

\ .FACTS

Roe and Watson were convicted of the 17 January 2011 armed robbery of Jonathan Henley (“Henley”). Roe was also convicted of the 8 March 2011 possession of a stolen firearm belonging to Henley and the possession of that firearm, having been previously convicted of a felony. Roe also was convicted of the 21 January 2011 armed robbery of Troy Elzy (“Elzy”).
New Orleans Police Department (“NOPD”) 911 Operator Lynerell Varise identified a 911 incident recall from 17 January 2011, and a corresponding audio recording of that call, which was played for the jury. The 911 call came in at 6:45 p.m. Ms. Varise confirmed that the 911 caller declined medical assistance. She was not sure if the caller was injured, but noted that he did say he had a knot on the back of his head. The caller said he had drawers on, and that “they” got his clothes.
Jonathan Henley, then twenty-three years old, testified that on 15 January 2011, he encountered a male named “Yellow” at a Petro gas station on Elysian Fields Avenue in New Orleans. Later in his testimony, he identified Watson as “Yellow.” Henley testified that Watson alerted him that he had dropped some money on the ground. When he picked it up, Watson told him that he had some Xanax “bars” and some marijuana for sale. Henley saw Watson later that same day at a “Brothers” gas station on Elysian Fields Avenue, at which point he and Watson exchanged telephone numbers. Henley decided to purchase marijuana from Watson at that time. They talked on 17 January 2011, and they came to an agreement for Watson’s sale to Henley of two ounces of marijuana for $900.00.
Later on the day of 17 January 2011, Henley drove his silver Chevrolet HHR rental car to a meeting with Watson in an alley alongside a Subway restaurant. |4Watson was in a green Chevrolet TrailBlazer automobile, which he exited to enter the passenger side of Henley’s vehicle. Henley said he took out his money, and Watson showed him the marijuana. Henley was counting out his money when Watson pulled a semiautomatic pistol and told him to “give it up,” stating that it was a robbery. Henley gave Watson the money. Another male exited the other vehicle and tapped on Henley’s driver’s side window with a revolver, telling him to open the door. Henley later identified this individual as Roe. Roe ordered Henley out of his car and directed him to take his clothes off and throw them in the car. Henley complied, stripping down to his boxer shorts and undershirt and putting everything else in his car. Henley said Roe then hit him with the revolver.
When asked whether he gave Watson the money for the drugs or in response to the order to “give it up,” Henley replied that he did so in response to Watson’s order to “give it up.” Henley replied in the negative when asked whether he and Watson ever completed the drug deal. His car was stolen in the robbery. The only name he knew at that time was ‘Yellow.”
Henley later met with NOPD Detective Duncan, who showed him what he estimated were six photo lineups, including State Exhibit 3, a single-photo of a female in *844 connection with a “two-tone [Dodge] Charger.” Henley identified State Exhibit 4, a photo lineup with his handwriting on the back, in which he did not select anyone’s photo. Henley confirmed that in State Exhibit 5, another photo lineup, he selected a photo as someone who looked similar to one of the two robbers. In State Exhibit 6, Henley identified his handwriting on the back and testified that he picked out photo number six, which he identified as a photograph of the second robber, who had been armed with a revolver. He identified that individual in court as Roe. Henley identified ■ State Exhibit 7 as a photo lineup with | ñhis handwriting on the back and on which he identified photo number three as being ‘Yellow.” Henley identified ‘Yellow” in court as the other defendant present, Watson. Henley also identified State Exhibit 8 as a single photograph of Watson with a fleur-de-lis tattoo on his neck and wearing a dreadlock hairstyle. Henley said he still recognized them “[l]ike yesterday.”
Henley testified on cross examination that he saw Watson at a Brothers gas station on Elysian Fields Avenue, probably some four or five hours after he first saw him at the Petro gas station, which also was on Elysian Fields Avenue. He said it was nighttime and that he was not sure why he went to the Brothers station, mentioning that he could have been purchasing chicken or a T-shirt. He said he told Watson hello in a friendly gesture because in their first encounter Watson had told him about the dropped money at the Petro station. He was also interested in purchasing some marijuana from Watson, and so the two exchanged phone numbers. Henley admitted that he smoked marijuana every day at that time. Henley confirmed that he owned a gun he had purchased from a store; that gun was taken/stolen in the robbery.
Henley further testified that he made arrangements with Watson to meet him at a Capital One Bank on Elysian Fields Avenue for the marijuana purchase/sale. Henley said he did not remember whether he smoked marijuana on 17 January 2011. He was planning to go to a party in Baton Rouge later that evening after purchasing the marijuana from Watson. The party was to be at the home of his friend, for whom he was purchasing marijuana — one ounce for himself, one ounce for his Baton Rouge friend. The robbery occurred at what he estimated was between 6:00-7:00 p.m., but he was not really sure about the time. It was Roe who|Bhit him in the back of his head. Henley testified that after the robbery, he called police from a washate-ria.
Henley admitted that he was shown the photo lineup labeled as State Exhibit 4 and confirmed that none of the photos depicted light-skinned individuals, but said he signed the back of photo number one because the detective had told him to indicate anyone who looked similar to a perpetrator. He said he thought that the person in photo number one looked similar to Roe, but not Watson. However, under further cross examination Henley confirmed that the individual depicted in photo number four in State Exhibit 4 did not look anything like either Roe or Watson.
Henley acknowledged that all of the individuals depicted in the photo lineup labeled as State Exhibit 5 were dark-skinned. He admitted that both State Exhibits 4 and 5 (photo lineups) were shown to him by the police on 30 January 2011, after he had given them a description of the two suspects. However, he later testified that he never gave a description until he went to talk to the detective, and he guessed 30 January 2011 was the first time he talked to the detective. Henley further confirmed that the police showed him a *845 photo lineup of dark-skinned individuals labeled as State Exhibit 9 on 17 March 2011. He confirmed that in the photo lineup labeled as State Exhibit 6, he identified Roe. He denied ever saying that he saw Watson in the St. Bernard Housing Project.
On redirect examination Henley identified his .40 caliber Glock Model 23 handgun — although he said he did not recognize the serial number at that time. He' confirmed that he had given the serial number of his gun to the police. Henley confirmed that his gun was in his car when it was stolen, and said he believed it had been in the pocket on the passenger side door. He remembered telling the [7poIice that he believed Watson was all “tatted up,” but did not initially specifically describe the fleur-de-lis tattoo on Watson’s neck. However, he confirmed that he remembered that tattoo.
NOPD Officer Brooke Duncan IV testified that he was a detective on 17 January 2011. On that date, he went to the scene of an- armed robbery involving Henley. The officer testified that Henley described the suspects as two light-skinned black males, one kind of stocky, and the other taller and with tattoos and long dread locks. One was nicknamed “Yellow” and had a tattoo of a fleur-de-lis on his throat and extensive tattoos on both arms. However, when questioned later on redirect examination as to why his report did not mention Watson’s throat tattoo, Officer Duncan said he did not think the victim saw it. The victim reported that he had seen ‘Yellow,” another male, and a woman the previous day, apparently in a cream and brown colored Dodge Charger automobile. On the night of the robbery, ‘Yellow” and the other perpetrator were in a blue/green colored Chevrolet TrailBlazer automobile. Henley admitted to Officer Duncan that he had been trying to purchase two ounces of high-grade marijuana, and the victim never changed his story. Henley had his personal .40 caliber Glock Model 23 handgun in his vehicle, which Officer Duncan listed as stolen on a NOPD database that was linked with the NCIC national database.
Officer Duncan stated that a vehicle matching the description of the two-tone Dodge Charger was subsequently stopped by the police with three people inside. Officer Duncan then compiled photo lineups (identified as State Exhibits 3, 4, and 5), one “lineup” apparently containing only a single photo of a female, the registered owner of the vehicle, and the other two lineups containing photos, respectively, of the two males who were also in that vehicle when it was stopped lRby the police. Officer Duncan said he considered the individuals in those lineups to be “more or less” light-skinned.
Officer Duncan said the next break on the case occurred in March 2011, when Roe was arrested in possession of Henley’s Glock handgun, identified through its serial number. He said that prior to Roe’s arrest, he had no suspects in the robbery. He compiled separate photo lineups, one containing Roe’s photo and the other containing a photo of Johnny Ray Barnes (“Barnes”), who was with Roe when Roe was arrested while in possession of Henley’s handgun. Barnes had an outstanding arrest warrant for attempted murder. Officer Duncan identified State Exhibit 6 as the lineup he presented to Henley in which Henley identified Roe as the person who forced him out of his vehicle and hit him on the head with a chrome-colored revolver during the robbery. Officer Duncan presented the lineup to Henley face down, and he said Henley identified Roe a few seconds after turning it over. Officer Duncan also identified State Exhibit 9 as the lineup containing a photo of Barnes. *846 He said Henley made no identification in that lineup.
Officer Duncan testified that Henley telephoned him on 17 May 2011, and related that he had been visiting a girlfriend in eastern New Orleans when he saw Watson. Officer Duncan immediately went to the scene and he saw Watson, who had shoulder-length dreadlocks and tattoos on his throat and his arms. Officer Duncan identified Watson in court. He stated that he approached Watson, advised him that he was a potential suspect in an armed robbery, and advised him of his Miranda rights. Officer Duncan said when he asked Watson his whereabouts on 17 January 2011, Watson replied that he was in federal custody.
IflOfficer Duncan later checked and determined that Watson had been in a federal halfway house on that date. Officer Duncan identified State Exhibit 12 as Watson’s sign-in/out sheet from a Volunteers of America (“VOA”) residential facility, showing that he checked out of the facility at 3:00 p.m. on 17 January 2011. He identified State Exhibit 7 as a photo lineup he presented to Henley on 19 May 2011, in which Henley selected Watson’s photo.
Officer Duncan testified that he interviewed Henley on the scene on the night of the robbery and later that same night at the NOPD Third District police station. Henley told him that on the night of 15 January 2011, he was walking into a gas station, and Watson, whom Henley identified as “Yellow,” told him that some money had fallen out of his back pocket. Henley said he thanked Watson, whereupon Watson offered to sell him two grams of high-grade marijuana.' Henley said he and Watson exchanged telephone numbers and agreed to meet two days later to complete the marijuana sale. Henley’s description of Watson, besides his hair and tattoos, was of a short, stocky, light-skinned black male in his thirties.
Officer Duncan then testified to his execution of a search warrant on 23 March 2011 at 3424 Freret Street, Roe’s last known address — the address he gave to former Officer Wheeler at the time he was arrested for illegal possession of Henley’s Glock. Discovered in the residence was a 19 January 2011 letter addressed to Roe at the address of 3424 Freret Street.
On cross examination, Officer Duncan said that Henley’s vehicle was recovered on Spain Street in New Orleans. The exterior was dusted for fingerprints, but no identifiable prints were recovered, probably due to rain the preceding day; he was uncertain whether the inside of the car was dusted for fingerprints. He testified that Henley identified one person who had been in the | mtwo-tone Dodge Charger as one of the two perpetrators. However, Officer Duncan later determined that that person had not been involved. He did not recall whether his report stated that ‘Yellow” had a fleur-de-lis tattoo on his neck, and the state stipulated that there was no such description in the report.
Former NOPD Officer Kevin Wheeler, who admitted that in November 2012 he was terminated from the NOPD for untruthfulness, testified that in March 2011 he responded to a call of an individual in the 2500 block of Valence Street who was wanted for a homicide. Officer Wheeler observed Roe and Barnes standing on the driver’s side of a SUV partially pulled into a driveway in that block. Officer Wheeler, in full uniform, exited his marked police unit, approached the men, said hello, and asked them what was going on. He observed Roe reach into his pocket and pull out what appeared to be a handgun. Roe then reached into the vehicle and went to the floorboard. Roe and Barnes then walked off down Valence Street. Officer *847 Wbeeler said he went to the car and asked a youth sitting inside where the gun was, and the youth told the officer it was underneath the seat at the youth’s feet. Officer recovered the gun, a loaded .40 caliber Glock Model 23. Officer Wheeler radioed other responding units, which stopped Roe and Barnes. He checked the gun’s serial number in the NCIC database and discovered it had been stolen in an armed robbery.
Raymond Delaney testified that in January 2011, he was the assistant program director at a federal halfway house located in New Orleans. Mr. Delaney testified that in January 2011, Roe and Watson were residing in that federal halfway house. He said there were sign in/out sheets and cameras at the front entrance from which residents enter and leave. In addition, a security specialist contractor on duty would verify that the halfway house resident signing in/out was Inin fact the resident listed on the sheet, which sheet he said is actually inside a folder containing a photograph of the resident. A security specialist also verifies the date and time the resident is signing in or out.
Mr. Delaney testified that, contingent upon a resident’s individual plan, the resident would leave the halfway house to go to work, to seek employment, to attend treatment, or go to any type of programming. No one was permitted to be out of the residence for more than twelve consecutive hours without approval from the Federal Bureau of Prisons. No one could leave the facility without verification of a case manager as to the reason for leaving. Mr. Delaney said that because of their respective statuses, Roe and Watson were very limited as to where they could go in the community. He replied in the negative when asked whether either Roe or Watson, for example, could have left to go to a friend’s birthday party. However, he indicated that they could have left to look for a job or gone to work if they had a job — after the employment had been verified by an employment specialist.
On cross examination, Mr. Delaney testified that on 17 January 2011, Watson was employed by “Black Tie.” He also confirmed that the Black Tie had to provide him with information confirming Watson was in fact employed by them. He acknowledged that the facility was a minimal security facility. While Mr. Delaney said on cross examination that he did not recall whether Roe or Watson had any infractions while at the facility, he testified that both of them had been put on escape status in January 2011, after they both left the facility without permission on 22 January 2011. Watson voluntarily returned on 24 January 2011.
|1?Elzy,[2] a reluctant vietim/witness who indicated that he came to court only because he had been subpoenaed, testified that on the night of 21 January 2011, he went to a bar and had one drink, and then he left. When he walked out, he was approached by a black male with a big gun, who robbed him of his wallet and keys. He watched that individual walk to his (Elzy’s) pickup truck, and he heard the truck start. He said he did not look back. Elzy returned to the bar, where the bartender called the police for him. Elzy testified that he and his friend found his truck the next day on “Louisiana.” Elzy acknowledged that he had a hangover the next day. His friend picked him up, and they drove to where his vehicle was locat *848 ed, where he observed a black male in his truck.
The prosecutor showed Elzy State Exhibit 18, a photo lineup containing Watson, and State Exhibit 19, a photo lineup containing a photo of Roe. Elzy said he remembered meeting with a detective who showed him some lineups, but he did not remember seeing those particular lineups. However, he confirmed that his signature was on the back of State Exhibit 18, which he said was dated 26 January 2011, and that he had not picked anyone out in that lineup. Elzy also recognized his signature on the back of State Exhibit 19, but he did not remember picking photo number three out of that lineup nor did he recognize the person depicted in photo number three. The prosecutor directed Elzy’s attention to “a few people sitting at that table over there,” and asked him if he recognized any of them. He said he did not, and he replied in the negative when asked whether he remembered “what they looked like on the night of the incident.”
| iSEIzy replied in the negative when asked on cross examination by Roe’s counsel whether he knew who Roe was or whether he had ever seen him before. While counsel for Watson did not cross examine Elzy, Roe’s counsel pointed out both Roe and Watson at the defense table by description, and Elzy said that was the first time he had seen either of the men.
NOPD Detective Gregory Johnson confirmed that on or around 21 January 2011, he became the lead detective in the investigation of an armed robbery (the subject of this case). Detective Johnson later read from his 27 January 2011 application for an arrest warrant for Roe for the 21 January 2011. armed robbery. Detective Johnson stated that one black male approached the victim, demanding that he “give it up,” and then another subject approached and pushed the victim from the back, demanding his wallet. Both perpetrators fled in the victim’s vehicle, a 2000 GMC Sierra truck, which was later found in the Second Police District located in uptown New Orleans. In his investigation, Detective Johnson developed the names of Watson and Roe. He determined that Roe and Watson were living in a VOA residence. He went to that facility in an effort to determine whether “the subjects” resided there, what time they left there, and what time they returned there. He was able to determine from video footage (presumably from the VOA residence) that the two men were not at the residence at the time of the 21 January 2011 robbery.
Detective Johnson compiled two six-photo lineups, which he identified as State Exhibits 18 and 19. When the prosecutor first began questioning him as to whether the victim identified anyone, counsel for Roe objected, arguing that “the alleged victim has already testified and denied ever seeing these people before,” clearly referring to Elzy, the previous witness who had testified that he was the |Hvictim of the 21 January 2011 robbery. Thus, although Detective Johnson actually never mentioned the name of the victim of the armed robbery he investigated, it was clear that the victim of that robbery was Elzy, who, as counsel for Roe correctly stated, had already testified and denied ever seeing either defendant before.
Detective Johnson further testified that the victim did not identify anyone in the State Exhibit 18 lineup, which contained Watson’s photo. However, the victim identified Roe without hesitation as “the person he seen [sic] get into his vehicle” when he showed him the State Exhibit 19 lineup. Detective Johnson explained that the victim could not identify Roe as the person who robbed him. He stated only that the victim identified Roe “as the person he observed exiting his vehicle or en *849 tering his vehicle.” He subsequently replied in the affirmative when asked whether the victim identified Roe “as a person he allegedly saw some time after the robbery”... “[e]xiting his vehicle.”
When Detective Johnson was asked how long it was between when the victim was robbed at gunpoint and “he saw ... Roe enter his vehicle,” he replied that he did not know exactly how long, “but during an armed robbery it doesn’t take long.”
NOPD Officer George Jackson was qualified by joint stipulation as an expert in latent fingerprint examination. Officer Jackson identified State Exhibit 21 as a fingerprint card containing a set of fingerprints he took the previous day from Roe in a back room of the courtroom. Officer Jackson identified State Exhibit 22 as a certified copy of a fingerprint card of Roe reflecting a booking date of 20 April 2001. The officer determined that the right thumbprints from State Exhibits 21 and 22 had been placed thereon by Roe. Officer Jackson confirmed 11Bthat among the documents comprising a certified conviction packet (“cert, pack”), identified as State Exhibit 24, was an arrest register. He confirmed that the unique “folder” numbers, the State Identification (“SID”) numbers, .social security numbers, booking numbers, and partial names (“Jason M.”), were the same on both the arrest register from the cert, pack and State Exhibit 22, the fingerprint card, both reflecting a 20 April 2001 booking date. Finally, Officer Jackson identified State Exhibit 25, a fingerprint card generated by the Louisiana Department of .Corrections bearing the name Roe, and the same social security number as on State Exhibit 22 and the arrest register, and all bearing the same case number, 421-956. Minute and docket master entries in case number 421-956 reflected that on 13 March 2002, Roe pleaded guilty to two counts of attempted armed robbery, after being informed of his constitutional rights by the court and knowingly waiving them. He confirmed that to the best of his knowledge, based on the cert, pack in case number 421-956, the crime was attempted armed robbery.
NOPD Detective Sabrina James testified that on 21 January 2011, she and her partner responded to a stolen vehicle call near the corner of Louisiana Avenue and Freret Street, relative to a white GMC truck. The detective and her partner were to conduct a surveillance of the vehicle, which she said was parked by 3424 Freret Street. Also, a green Ford Explorer vehicle was at that location. Two or three black males together split up, entered both vehicles, and drove off. Detective James was not close enough to see their faces, and she did not recognize either of the defendants in court. She and her partner attempted to follow the stolen vehicle when it drove off, but it was unoccupied by the time other officers finally located it.
Jigin.

ERRORS PATENT

A review of the record reveals three errors patent on the face of the record.
First, the record does not reflect that the trial court waited twenty-four hours before sentencing both defendants after denying their respective motions for new trial and for post-verdict judgment of acquittal, or that either defendant waived the delay.
La.C.Cr.P. art. 873 states that a sentence shall not be imposed until at least twenty-four hours after the denial of a defendant’s motion for new trial. This court has also held that the failure of a trial court to wait at least twenty-four hours before sentencing a defendant after denying his motion for post-verdict judg *850 ment of acquittal constitutes an error patent on the face of the record. State v. Green, 10-0791, pp. 19-20 (La.App. 4 Cir. 9/28/11), 84 So.3d 573, 586; State v. Wilson, 526 So.2d 348, 350 (La.App. 4th Cir.1988).
However, the failure to observe the twenty-four-hour delay is harmless where the defendant does not complain of his sentence on appeal. State v. Duncan, 11-0563, p. 8 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 511; State v. Green, 10-1355, p. 12 (La.App. 4 Cir. 6/22/11), 69 So.3d 695, 703.
In the case at bar, neither defendant complains of his respective sentence on appeal. Therefore, the trial court’s failure to observe the twenty-four hour delay is harmless and requires no action by this court.
The second error patent is the record fails to reflect that Roe and Watson were sentenced, as to their respective convictions in Count 1 for armed robbery with a firearm, to the mandatory additional sentence pursuant to La. R.S. 14:64.3 |17A[3] of five years imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, to be served consecutively to the sentence imposed pursuant to La. R.S. 14:64 for the armed robbery. Therefore, we must vacate those sentences and remand for resentencing in accordance with La. R.S. 14:64 and the mandate of La. R.S. 14:64.3. State v. Cooper, 12-0174, p. 9 (La.App. 4 Cir. 7/10/13), 120 So.3d 844, 848-849, writ denied, 13-1931 (La.2/28/14), 134 So.3d 1174.
The third error patent is the trial court’s failure to impose the mandatory fine on Roe when sentencing him for his conviction in Count 3 for possession of a firearm by a convicted felon, as provided for in La. R.S. 14:95.1 B (“... shall be imprisoned at hard labor ... and be fined not less than one thousand dollars nor more than five thousand dollars.”).
The trial court’s failure to impose the mandatory fine provided for by La. R.S. 14:95.1 B requires that the case be remanded for the imposition of the fine. State v. Galle, 11-0930, p. 36 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 937, writs denied, 13-0752 (La.10/30/13), 124 So.3d 1102, 13-0561 (La.11/1/13), 124 So.3d 1107 (citing State v. Stephens, 09-0631, p. 10 (La.App. 4 Cir. 11/24/09), 27 So.3d 987, 993).
_biv.
WATSON — ASSIGNMENT OF ERROR NO. I
In his first assignment of error, Watson argues that the evidence was insufficient to support his conviction for armed robbery.
This court established the standard of review for sufficiency of the evidence in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. However, the review *851 ing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.”
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, ... but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. [Internal citations omitted.]
Id., quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107.
|inThe testimony of a single witness, if believed by the trier of fact, is ordinarily sufficient to support a conviction. State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996. When the identity of the defendant as the perpetrator is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia,[4] Galle, 11-0930, p. 31, 107 So.3d at 935; State v. Everett, 11-0714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619. The due process standard of review under Jackson does not sanction juror speculation if the evidence is such that a reasonable fact finder must have a reasonable doubt. State v. Higgins, 03-1980, pp. 17-18 (La.4/1/05), 898 So.2d 1219, 1232 (citing State v. Lubrano, 563 So.2d 847, 850 (La.1990)).
The basis of the present assignment of error is Watson’s assertion that his identification by the victim, Henley, in the 17 January 2011 armed robbery was unreliable, and thus the state did not negate any reasonable probability of misiden-tification.
Watson argues that Henley initially claimed that the armed robber known to him as “Yellow” had a brown complexion, but that Henley subsequently identified him, even while admitting that he is light-skinned. However, Henley never testified that “Yellow” had a brown complexion. Moreover, the two photos of Watson in evidence — one depicting him with close-cropped hair in the photo lineup (State Exhibit 7), and one depicting him with long dread locks and the fleur-de-lis tattoo on his neck (State Exhibit 8) — show that he is a light-skinned black lámale. Watson’s skin tone is light-brown, and a description that he had a “brown” complexion would *852 not have been totally inaccurate. Officer Duncan, who investigated the case and compiled and presented to Henley all the photo lineups in the case, testified that Henley reported that both robbers were light-skinned.
Watson is correct that Henley identified a dark-skinned individual in a lineup presented to him by Officer Duncan. This was in the photo lineup labeled as State Exhibit 5. However, Henley explained that Officer Duncan indicated that he should note a photo even if he did not think it looked exactly like the perpetrator. Further, Henley testified that he believed that the individual in State Exhibit 5 possibly could be the “second robber” — clearly meaning Roe — not Watson. Roe came to the driver’s side window of Henley’s car after Watson had already pulled a gun inside of the vehicle to rob Henley. Thus, Roe was the “second robber.”
Also, Officer Duncan testified that Henley told him that he saw Watson in a two-toned Dodge Charger on the first occasion he encountered Watson in the gas station parking lot, when Watson alerted Henley that he had dropped some money. A vehicle matching that description was later stopped by police, and inside was a female and two males. Photo lineups State Exhibits 4 and 5 contained photos of these two males who had been in the two-toned Dodge Charger when it was stopped by police. As it turned out, these two males were not involved in the robbery of Henley.
Watson did not become a suspect until almost four months after the robbery, when Henley happened to see Watson in ,an Eastern New Orleans neighborhood. Henley contacted Officer Duncan, who immediately went to the scene and interviewed Watson. Officer Duncan later compiled a photo lineup containing | nWatson’s photo, and Henley identified Watson as “Yellow,” the person who arranged to sell him marijuana and then robbed him of the money that he brought to pay for the marijuana.
While the robbery occurred at night, Henley was face-to-face with Watson on two occasions within a three-day period, including when Watson finally robbed him at gunpoint while seated in the passenger seat of Henley’s vehicle during the would-be drug sale. State Exhibit 8, the individual large photograph of Watson, depicts him as he appeared at the time of the armed robbery for which he was convicted, with a long dread lock hairstyle and the fleur-de-lis tattoo on his neck. Watson also had tattoos adorning both arms at the time of the robbery, which are not visible in State Exhibit 8. Henley identified Watson in photo lineup State Exhibit 7, containing a photo of Watson with close-cropped hair and no visible neck tattoo. Watson’s arms are not displayed in either the State Exhibits 7 or 8 photos.
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court set forth five factors for courts to consider in determining, based on the totality of the circumstances, whether a suggestive identification procedure presented a substantial likelihood of misidentification. Although no suggestive identification procedure appears in the present case, this court employs the five Manson criteria to assist in assessing the reliability of eyewitness identifications when reviewing the sufficiency of the evidence insofar as the state’s burden to negate any reasonable probability of mis-identification when a defendant disputes identity. See State v. Santos-Castro, 12-0568, p. 22 (La.App. 4 Cir. 7/31/13), 120 So.3d 933, 946-947 (citing State v. Lewis, 11-0999, pp. 6-9 (La.App. 4 Cir. 5/23/12), 95 So.3d 533, 537-538). The five factors are: (1) the witness’s opportunity to view *853 | agthe criminal at the time of the crime; (2) the witness’s degree of attention; (B) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. 2243.
Henley had a good opportunity to view Watson at the time of the robbery, which occurred as Henley sat in the driver’s seat of his car and Watson in the front passenger seat. No evidence exists to suggest that Henley was not being attentive. In addition, he had seen Watson two days earlier. Officer Duncan said Henley accurately described Watson as a light-skinned male with long dreadlocks, who was all “tatted up.” Henley displayed no uncertainty when identifying Watson in the State Exhibit 7 lineup, the only photo lineup in which Watson’s photo appeared. Henley identified Watson in the photo lineup approximately four months after the robbery.
In addition, Watson was tried jointly with Roe for the armed robbery of Henley. Henley positively identified Roe in lineup State Exhibit 6 as Watson’s co-perpetrator in the 17 January 2011 robbery. Roe was arrested less than two months after the robbery after being seen by a police officer discarding a handgun which turned out to have been taken in the armed robbery of Henley. The evidence established that at the time of the armed robbery of Henley, Watson and Roe were both residents of a VOA federal halfway house, and that both were absent from the halfway house at the time of the robbery.
Watson does not dispute that the crime for which he was convicted was one in which cash in the immediate control of and belonging to Henley was taken from him by the use of force or intimidation while the offender was armed with a dangerous weapon, to — wit, a firearm — armed robbery with a firearm.
| ^Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Watson was a principal in the armed robbery with a firearm of Henley.
We find no merit to this assignment of error.
V.
WATSON — ASSIGNMENT OF ERROR NO. 2
In Watson’s second assignment of error, he argues that the trial court erred in denying his motion for mistrial that was based on the prosecution’s alleged comment on his failure to testify.
During closing argument by counsel for Watson, the following colloquy transpired:
MR. LANDRY:
Very clearly Joshua wears eyeglasses. Never once did he mention eyeglasses in his report.
MR. POCHE:
Objection, Judge. How is that clear?
THE COURT:
You get to argue that it is not clear.
During the State’s rebuttal argument the following colloquy transpired:
MR. POCHE:
I wear contacts. I also wear glasses. When my eyes bother me I put my glasses on. I run out of contacts I put my, glasses on. But I wear contacts everyday [sic]. Mr. Watson has glasses on. He could have taken the stand and told you about his eye sight but Mr. Landry wants to make a big deal about—
MS. VAN HORN:
Objection, your Honor.
*854 THE COURT:
That’s sustained. He had no obligation to take the, witness stand. None whatsoever.
IímMR. POCHE:
Mr. Landry wants to make a big deal about the eyeglasses. That Mr. Watson always wears these eyeglasses. Did you hear any information about [sic], from any witness that took this stand from the States
MS. VAN HORN:
Objection, your honor—
THE COURT:
That’s sustained. That’s sustained as well. He has no obligation to put on any witness or do anything.
MR. POCHE:
I can’t even finish my statement. You have no information from this witness stand by State witnesses that they have ever seen Mr. Watson with glasses. Detective Duncan saw him and Henley saw him. He didn’t have glasses either day. Now he sits there today with glasses. So what! So what! Why does that matter? It’s a miss ID because he has glasses now.
After the jury retired to deliberate, one of Watson’s attorneys, Ms. Van Horn, moved for a mistrial based on prosecutor Mr. Poche’s comment concerning Watson not taking the witness stand, characterizing it as a comment on Watson’s failure to testify. The trial court stated that it “didn’t hear the word defendant at all.” The prosecutor who made the comments, Mr. Poche, represented that he recalled stating that “nobody has taken the stand saying Mr. Watson wears glasses and then I was objected to” and that he eventually said “no one has taken the stand and said he wears glasses as a witness for the state. I said Detective Duncan and Mr. Henry [sic] both seen [sic] Mr. Watson and he did not have glasses on and that’s why I made the statement.”
The prosecutor was mistaken. The prosecutor said: “Mr. Watson has glasses on. He could have taken the stand and told you about his eye sight....”
La.C.Cr.P. art. 770 states, in pertinent part:
12sUpon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
[[Image here]]
(3) The failure of the defendant to testify in his own defense; or
[[Image here]]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
In its brief, the state essentially concedes that the prosecutor made a “reference” to Watson’s decision not to testify in his own behalf. The prosecutor’s comment quoted above was a direct or indirect reference to Watson’s failure to testify in his own behalf. Defense counsel contemporaneously objected and timely moved for a mistrial after the jury retired to deliberate.
At the time of the objection the trial court immediately sustained it and essentially admonished the jury that Watson “had no obligation to take the witness stand. None whatsoever.” However, at no point did Watson request that an admonishment be given as contemplated by *855 La.C.Cr.P. art. 770. Thus, Watson did not waive his right to the mandatory mistrial provision. Thus, the trial court erred in denying Watson’s motion for a mistrial.
However, comment on a defendant’s failure to take the stand is a trial error, not a structural defect in the proceedings, and such error is subject to harmless error analysis at the federal level pursuant to Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). State v. Thomas, 05-2373, p. 1 (La.4/17/06), 926 So.2d 490, 491. The mandatory mistrial provisions of La.C.Cr.P. art. 770 do not preclude a harmless error review of a prosecutor’s direct or indirect comment on a defendant’s failure to testify in his own behalf. Id., pp. 1-2, 926 So.2d at 491.
|2fiThe state points out that in defense counsel’s closing argument on behalf of Watson, counsel referred to both defendants being afraid to “take the stand.” Watson’s defense counsel argued:
Well, you got two armed robberies unsolved. They can’t find out who did it. What is in the vicinity? A Federal halfway house. Perfect. Snatch up .two individuals from the halfway house and they won’t be able to take the stand because the prosecution will tear them down. Will tear them down and paint them red and they are scared to death to take the stand because they know that is going to happen and the police know that is going to happen. Everything that they have ever been accused of and they will throw it out there and they will paint a horrible picture of those two individuals who can’t defend themselves. And they know that. That’s why they have been gunning for them since January 26th.
Considering the strong evidence of Watson’s guilt, together with his counsel’s ac-knowledgement to the jury in closing argument that his client did not “take the stand” because of his prior record, and also the fact that the jury was well aware that both Watson and Roe were in federal custody (i.e., that each had been convicted of a crime) as residents of a federal halfway house at the time of the alleged robbery of Henley, Watson has failed to show that he was substantially prejudiced by the prosecutor’s comment that he “could have taken the stand and told you about his eye sight”—which obviously was dire'cted at rebutting defense counsel’s closing argument concerning Watson wearing glasses in court.
An error is harmless beyond a reasonable doubt if the verdict “was surely unattributable to such error.” State v. Robertson, 06-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172 (quoting State v. Johnson, 94-1379, p. 18 (La.11/27/95), 664 So.2d 94, 102). The jury’s verdict of guilty as to the charge that Watson robbed Henley at gunpoint was surely unattributable to the prosecutor’s comment.
We find no merit to this assignment of error.

JnVL

WATSON—ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, Watson argues that the trial court erred in denying his motion to sever the offenses.
The trial court denied one motion filed by Watson to sever the defendants and one motion by him to sever the offenses. In this assignment of error, Watson only argues that the trial court erred in denying his motion to sever the offenses—Count 1, the armed robbery of Henley, with which both defendants were charged, from the other three counts in which Roe alone was charged. Watson does not dispute that *856 the offenses were properly charged together in the bill information in accordance with La.C.Cr.P. art. 493.[5]
La C.Cr.P. art. 495.1 provides for severance of offenses, and states:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
A motion to sever offenses is directed to the sound discretion of the trial court, and the court’s ruling thereon should not be disturbed on appeal absent a showing of an abuse of that discretion. State v. Brooks, 541 So.2d 801, 804 (La.1989), citing State v. Williams, 418 So.2d 562, 564 (La.1982); State v. Cooper, 12-0174, p. 10 (La.App. 4 Cir. 7/10/13), 120 So.3d 844, 849, writ denied, 13-1931 (La.2/28/14), 134 So.3d 1174. When ruling on a motion to sever, a trial court must weigh the possibility of prejudice to the accused against the important considerations of economical and expedient use of judicial resources. State v. Grimes, 11-0984, p. 50 (La.App. 4 Cir. 2/20/13), 109 So.3d 1007, 1035, writ denied, 13-0625 (La.10/11/13), 123 So.3d 1216. In determining whether joinder of the offenses will be prejudicial, a court should consider whether: (1) the jury would be confused by the various counts; (2) the jury would be able to segregate the various charges and evidence; (3) the defendant would be confounded in presenting his various defenses; (4) the crimes charged would be used by the jury to infer a criminal disposition; and (5) especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Hugle, 11-1121, p. 15 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 611, writ denied, 12-2721 (La.6/14/13), 118 So.3d 1079.
A defendant bears a heavy burden of proving prejudicial joinder of offenses, and he must make a clear showing of prejudice. State v. Ennis, 11-0976, p. 11 (La.App. 4 Cir. 7/5/12), 97 So.3d 575, 582.
On the face of the charges, the 17 January 2011 armed robbery of Henley with which Watson and Roe were charged jointly in Count 1 was clearly distinguishable/separable from the 21 January 2011 armed robbery of Elzy with which Roe alone was charged. The two gun charges against Roe alone (possession of a firearm by a convicted felon in Count 3 and illegal possession of a stolen firearm in Count 4) are alleged to have occurred on 8 March 2011; they were clearly distinguishable/separable from the 17 January 2011 armed robbery, with which Watson and Roe was jointly charged.
129The evidence established that the gun at issue in the two gun charges involving Roe was the one stolen in the 17 January 2011 .armed robbery with which both defendants were charged. The bill of information as to that count of armed robbery alleged that both defendants “robbed Jonathan Henley of a motor vehicle and/or a handgun and/or shirt and/or pants.” The evidence clearly established that Roe was in possession of that gun in March 2011 when he was approached by former Officer *857 Kevin Wheeler, and that evidence was the basis of both of those two gun charges against Roe.
As to the 21 January 2011 robbery, at least two black male perpetrators were involved in that robbery. Elzy was presented with two photo lineups at trial, one containing Watson’s photo and one containing Roe’s photo. While Elzy did recall being shown more than one photo lineup, he testified that he did not recall them specifically.
However, Elzy replied in-the affirmative when asked if he recognized his signature on State Exhibit 18, the lineup containing Watson’s photo. Elzy confirmed that State Exhibit 18 did not indicate that he had selected anyone in that lineup. When shown State Exhibit 19, Elzy confirmed that his signature was on that lineup, but he said he did not recognize “him,” apparently meaning the person in photo number three, who presumably was Roe. When asked whether he had picked number three in the State Exhibit 19 lineup but just did not remember it, Elzy replied that he did not remember doing so. Elzy also replied in the negative when asked by the prosecutor whether he recognized anyone sitting “at that table over there,” presumably meaning the defense table where the defendants were seated.
lanNOPD Detective Johnson testified that he developed Watson and Roe as suspects in the 21 January 2011 armed robbery of Elzy, and that Elzy had identified Roe in the State Exhibit 19 photo lineup as one of the perpetrators, but that Elzy was unable to identify anyone in the State Exhibit 18 lineup containing Watson’s photo. Detective Johnson also testified that he determined that Roe and Watson were living in a VOA residence, and that he was able to determine from video footage that the two men were not at the residence at the time of the 21 January 2011 robbery.
Thus, the jury was apprised that Watson, a fellow resident of the VOA federal halfway house facility with Roe, had been a suspect in the Elzy robbery, and that both he and Roe were absent from the VOA facility at the time of the Elzy robbery. Commonsense suggests that members of the jury could have speculated that Watson might have been the second perpetrator in the 21 January 2011 robbery, as he was in the 17 January 2011 robbery, four days earlier.
Watson notes several statements in the state’s closing/rebuttal arguments where the prosecutor made direct and/or indirect references to his participation in the 21 January 2011 robbery, arguing that the prosecutor added to the alleged confusion concerning the four counts being tried.
The prosecutor, detailing the timeline and facts, commented that the defendants were not at the VOA halfway house on 21 January 2011, and said: “They were out on this street committing this armed robbery.” The prosecutor later stated in argument: “Mr. Watson is only charged with that one armed robbery because he is not identified by Mr. Elsey [sic] on the 1-21 incident, okay.” Later, during rebuttal, the prosecutor stated:
|31Mr. Elsey can only ID one person for what happened. He picks out number three. Mr. Elsey did not deny that this was his signature. That he wrote this number three. That he wrote this date. He just didn’t want to come to court and point out somebody, but he picked them out this day. Number three, Mr. Roe_ [Emphasis added.]
These comments came during the state’s closing/rebuttal argument, long after the trial court had denied Watson’s motion to sever the offenses. The making of these comments by the prosecutor is a separate issue from the issue of whether the trial court abused its discretion in denying Watson’s motion to sever the offenses. Fur *858 ther, at no point did counsel for Watson object to the comments. Had he done so, the trial court could have sustained the objection and admonished the jury that Watson was not charged with the 21 January 2011 robbery.
Considering the totality of the circumstances, we do not find the trial court abused its discretion in concluding that the joinder of the three additional counts against Roe only would result in: (1) the jury being confused by the various counts; (2) the jury being unable to segregate the various charges and evidence; (3) Watson being confounded in presenting his defense to the Henley robbery; (4) the jury using any inference that Watson was involved in the Elzy robbery to unfairly infer a criminal disposition as to him insofar as the Henley robbery;[6] or (5) making the jury hostile to the extent that it would convict Watson of the Henley robbery based on anything other than the evidence presented as to his participation in that robbery.
Thus, the trial court did not abuse its discretion in denying the motion to sever the three additional counts with which Roe alone was charged from the one |32count with which both defendants were charged. The record does not reflect that Watson sustained substantial unfair prejudice by the joinder of the offenses. See La. C.Cr.P. art. 921.[7]
No merit exists in this assignment of error.
VH.
ROE — COUNSELED ASSIGNMENT OF ERROR NO. 1
In his first counseled assignment of error, Roe argues that the evidence was insufficient to convict him of the 21 January 2011 armed robbery with a firearm of Elzy, as alleged in Count 2 of the bill of information. The issue in this sufficiency argument is the alleged lack of evidence supporting a finding that he was one of the perpetrators of that robbery.
The applicable statutory and jurisprudential law governing review for sufficiency of the evidence to sustain a conviction was previously set forth supra.
Detective Johnson testified on direct examination that the victim of the 21 January 2011 armed robbery did not identify anyone in the State Exhibit 18 lineup, which contained Watson’s photo. Detective Johnson further testified on direct examination that in the State Exhibit 19 lineup — both lineups were shown to the victim on 26 January 2011 — the victim identified Roe without hesitation “as the person he seen [sic] get into his vehicle.” Detective Johnson explained on cross examination that the victim could not identify Roe as the person who put the gun on him and robbed him of his wallet and car keys. The detective further stated on cross examination that the victim identified Roe “as the person he observed exiting |sahis vehicle or entering his vehicle.” Detective Johnson testified that the victim “couldn’t identify him as the person who allegedly robbed him.” The following colloquy then occurred between counsel for Roe and Detective Johnson:
Q He could not, okay. So he identified him as a person he allegedly saw some time after the robbery?
A Yes.
*859 Q Exiting the vehicle?
A Yes.
Q How did he — that’s what he indicated to you when he signed that?
A Yes, sir.
⅜ ⅛ *
Q The victim identified him as what?
A As the person he observed entering his vehicle.
Q Entering his vehicle?
A Right.
Elzy was a reluctant witness who admitted on direct examination that he was in court only because he had been subpoenaed and had been informed of the legal consequences of not appearing. He did not remember identifying anyone in a lineup, although he confirmed that his signature was on both the State Exhibits 18 and 19. He left a bar and was approached by a black male with a gun. He testified: “I turned around and put my head down and I didn’t see the guy.” He confirmed that after he gave up his wallet and keys, “they” got in his vehicle. When asked if there was more than one person, he said that he just saw one at the Intime. He testified that he saw that person walk to the truck, and he heard his truck being started. He said he did not look back. He could not say who the person was with the gun.
Elzy testified that later the same morning his “podna” saw the truck traveling down the interstate. His “podna” picked him up and they found the truck uptown on “Louisiana and Louisa.” Elzy stated that when he and his “podna” were approximately one and a half blocks from the truck, “I started watching the guy get in the truck.” He testified that his “podna” called 911 and was told to leave the matter alone. Elzy said he could not tell who was driving his truck, only that it was a black male.
When the prosecutor asked Elzy on redirect examination if he remembered stating that there was one person he “definitely saw,” Elzy replied: “I didn’t say that.” When asked whether he remembered seeing one person walking to his truck, he replied: “Something like that.” The prosecutor also asked Elzy on redirect examination whether he saw a black male walk to the “car” — clearly meaning his white GMC truck — when he went to go recover it. Elzy replied in the affirmative, but stated: “[L]ike I said I was too far down to see him so I couldn’t see him.” Finally, on redirect examination Elzy responded to a question by the prosecutor, stating that it had been a black male who approached him on the night of the robbery. The prosecutor immediately followed with a question as to whether “[t]he guy you saw walk to the car” was black, to which Elzy replied in the affirmative.
Detective James confirmed that on 21 January 2011, she and her partner relocated to the area of Louisiana Avenue and Freret Street in response to a stolen vehicle call relative to a white GMC truck. She set up a surveillance of the white |,5GMC truck, which she stated was parked by 3424 Freret Street. When asked if she saw another vehicle at that location, she replied in the affirmative, describing the second vehicle as a green Explorer. She observed two or three black males go toward the white GMC truck and the Explorer, but she was not close enough to see their faces. She did not recognize either of the defendants in court.
Detective Johnson testified that he determined from video surveillance footage that neither Roe nor Watson were at the VOA federal halfway house at the time of the 21 January 2011 robbery. We note that State Exhibit 12, Watson’s sign in/ *860 sign out sheet for the federal halfway house where Roe and Watson resided, shows that on 21 January 2011, Watson signed in at 2:00 a.m. — which, based on other sign-in dates, was a regular sign-in time for him. This document was admitted into evidence and presented to the jury. Detective Johnson testified that his application for the arrest warrant for Roe stated that Elzy was robbed on 21 January 2011 at approximately 1:55 a.m. There was no sign in/sign out sheet from the federal halfway house introduced in evidence as to Roe, but the state’s obvious theory of the case was that Elzy was robbed by both Roe and Watson; Detective Johnson testified that he determined from video camera footage from the halfway house that both Roe and Watson were away from the halfway house at the time Elzy was robbed. However, we note no testimony as to how far away the federal halfway house in question was from the location where Elzy was robbed, or how long it would take to travel between the two locations. Again, Elzy was robbed at approximately 1:55 a.m., and Watson was back at the halfway house by 2:00 a.m.
In addition, Raymond Delaney, the assistant program director at the halfway house testified that Roe’s last date present in the halfway house was 22 January 2011, when he left the facility without permission. Mr. Delaney did not mention |afiany infraction concerning Roe for 21 January 2011, suggesting that Roe returned to the halfway house as scheduled, whatever that time might have been.
Officer Duncan, who investigated the earlier 17 January 2011 armed robbery with which both Roe and Watson were charged, testified that he executed a search warrant at 3424 Freret Street on 23 March 2011. Discovered in the residence was a letter addressed to Roe at that address, dated 19 January 2011. Officer Duncan testified that 3424 Freret Street was Roe’s last known address — the address he gave to former Officer Wheeler when he was stopped by that officer in March 2011 and found to be in possession of Henley’s Glock handgun.
Detective Johnson’s testimony as to Elzy identifying Roe in the photo lineup was substantive evidence, not hearsay. See La. C.E. art. 801 D(l)(c) (A prior statement by a witness is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is “one of identification of a person made after perceiving the person.”); see also State v. Duncan, 11-0563, p. 18 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 516 (“A statement of identification by a witness of a person after perceiving him — as contemplated by La. C.E. art. 801(D)[sic](1)(c) — may be used assertively, as substantive evidence of guilt, and may be established through the testimony of the person to whom the statement was made, even if the witness denies making an identification or fails to make an in-court identification.”).
Elzy admitted that his signature was on State Exhibit 19 and, while he never admitted that he selected photo number three, he did not deny selecting that photo. The evidence indicates that photo depicted Roe. Detective Johnson testified that Elzy selected the photo without hesitation.
137However, the real issue before us is what exactly Elzy identified Roe as having done. We find no direct evidence, testimonial or otherwise, or evidence from which it can be inferred, that Elzy ever told Detective Johnson that he saw the face of the gunman who robbed him of his wallet and car keys. Elzy’s testimony was that he only saw a person walking toward his truck after he was robbed of his wallet and car keys, and that he heard his truck start. There is no evidence that Elzy saw the *861 face of that individual — although Detective Johnson testified that Elzy identified Roe as the person he saw walking to his truck after the robbery, the detective indicating that this was immediately after the gunman took Elzy’s car keys and wallet.
As the quoted colloquy of Detective Johnson’s cross examination shows, his testimony was inconsistent as to whether Elzy identified Roe as the individual he saw exiting his vehicle or as the individual he saw entering it. Elzy clearly testified that he saw a black male exiting his truck when he and his “podna” were approximately one and a half blocks away from the truck, which would have been close in time to when Detective James observed the truck in front of 3424 Freret Street, a known address of Roe. Elzy also confirmed that on Freret Street he also observed a black male walk to the truck. Finally, Elzy seemed to confirm on direct examination that he observed the black male who robbed him at gunpoint walk toward his truck after he gave that gunman his keys and wallet and that he then heard his truck being started. We find no direct or inferential evidence that anyone other than Elzy exited his vehicle at the scene of the robbery. Thus, any reference to Roe or any other black male exiting Elzy’s truck would necessarily have to relate to the scene outside 3424 Freret Street later on the same day as the robbery.
laSThe due process standard of review under Jackson v. Virginia, does not sanction juror speculation if the evidence is such that a reasonable fact finder must have a reasonable doubt. Higgins, supra.
Detective Johnson was the only witness who testified as to what act Elzy identified the defendant as having done. Detective Johnson’s testimony in that respect was confusing and inconsistent. Viewing all the evidence in a light most favorable to the prosecution, it would be pure speculation to conclude exactly what act(s) Elzy identified Roe to Detective Johnson as having done — (1) walking toward his truck immediately after he was robbed at gunpoint of his wallet and car keys; (2) entering his truck at the scene of the armed robbery; and/or (3) entering and/or exiting his truck on Freret Street. Viewing all the evidence in a light most favorable to the prosecution, no rational trier of fact could have found beyond a reasonable doubt that Roe was a principal to the actual armed robbery of Elzy — and not simply an individual seen exiting or entering Elzy’s truck when it was parked in front of 3424 Freret Street later on the morning of the robbery.
We find merit to this assignment of error, and therefore reverse Roe’s conviction and sentence for armed robbery with a firearm (Count 2).
VIII.
ROE — COUNSELED ASSIGNMENT OF ERROR NO. 2
In his second counseled assignment of error, Roe argues that the trial court erred in denying the motion to sever the offenses. For the same reasons discussed in addressing Watson’s assignment of error on the motion to sever the offenses, we find no merit to this assignment of error. Moreover, Roe’s argument in this assignment of error focuses on the charge in Count 2. He argues that the facts concerning his participation in the earlier 17 January 2011 armed robbery allowed |S9the prosecutor to bootstrap evidence of one offense where there was an identification (meaning the Henley robbery) to the.other (the Elzy robbery) where the evidence was lacking. However, as we have concluded that the evidence was insufficient to support Roe’s conviction of the 21 January *862 2011 armed robbery of Elzy, the severance issue is moot.
We find no merit to this assignment of error.
IX.
ROE — COUNSELED ASSIGNMENT OF ERROR NO. 3
In his third counseled assignment of error, Roe argues that his conviction for two offenses arising out of the same criminal conduct — armed robbery and illegal possession of Henley’s Glock (one of the objects of the armed robbery) — violates the double jeopardy provisions of the Fifth Amendment to the U.S. Constitution and La. Const. art. I, § 15.
Roe concedes that his trial counsel did not raise the issue of double jeopardy in the trial court. The state asserts in its appellate brief that because Roe did not raise a claim of double jeopardy in the trial court before, during, or after trial, this issue was not preserved for appellate review. While La.C.Cr.P. art. 594 provides that “[d]ouble jeopardy may be raised at any time,” it also states that it shall be tried by the court alone, and that if raised during the trial, a hearing thereon may be deferred until the end of trial. However, this court has recognized a violation of a defendant’s right against double jeopardy to be an error patent. See State v. Gibson, 08-0647, p. 7 (La.App. 4 Cir. 2/4/04), 867 So.2d 793, 798 (noting that double jeopardy has been recognized as a patent error, but addressing it as an assignment of error because the defendant raised it as such, apparently for the first Lntime on appeal); State v. Thomas, 99-2219, p. 4 (La.App. 4 Cir. 5/17/00), 764 So.2d 1104, 1108 (reviewing double jeopardy issue as a patent error).
Accordingly, consistent with Gibson, defendant’s double' jeopardy claim will be addressed as an assignment of error raised for the first time on appeal.
Both the Fifth Amendment to the United States Constitution and Article I, § 15 of the Louisiana Constitution guarantee that no person shall be twice placed in jeopardy for the same offense. See also La.C.Cr.P. art. 591.[8] Although La.C.Cr.P. art. 596 speaks of double jeopardy relative to a second prosecution, the prohibition against double jeopardy also protects an accused from multiple punishments for the same criminal conduct, which principle is the basis of Roe’s argument here. Gibson, 03-0647, p. 8, 867 So.2d at 798-799.
In State v. Magee, 11-0574, pp. 6-7 (La.9/28/12), 103 So.3d 285, 335, the Court succinctly set forth the two tests employed to determine whether a defendant’s right against double jeopardy has been violated:
When the same act or transaction constitutes a violation of two distinct statutory provisions, in assessing whether there are two offenses or only one, the Supreme Court uses the “additional fact” test Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Under this test, the provisions of each statute are analyzed to determine whether each requires proof of a fact which the other does not. Id. In addition, Louisiana courts utilize a somewhat broader “same evidence” test, which considers the actual physical and testimonial evidence necessary to secure *863 a conviction. State v. Williams, 07-0931, p. 5 (La.2/26/08), 978 So.2d 895, 897. Under this test, if the evidence required to support a finding of guilt of one crime would also support a conviction for another, the defendant can be placed in jeopardy for only one of the two. State v. Coody, 448 So.2d 100, 102-03 (La.1984); State v. Steele, 387 So.2d 1175, 1177 (La.1980).
In Count 1 of the bill of information it was charged that on 17 January 2011, Roe:
WHILE ARMED WITH A DANGEROUS WEAPON, TO WIT: A FIREARM, ROBBED JONATHAN HENLEY OF A MOTOR VEHICLE AND/OR A HANDGUN AND/OR SHIRT AND/OR PANTS
In Count 4 of the same bill of information it was charged that on 8 March 2011, Roe:
DID ILLEGALLY AND INTENTIONALLY PROCURE, RECEIVE, POSSESS OR CONCEAL A FIREARM, BELONGING TO JONATHAN HENLEY, THE SAID JASON M. ROE KNOWING OR HAVING REASON TO BELIVE [sic] THAT THE FIREARM WAS THE SUBJECT OF A ROBBERY OR A THEFT
La. R.S. 14:64 A defines armed robbery, and states:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another,' by use of force or intimidation, while armed with a dangerous weapon.
La. R.S. 14:64.3 A additionally provides that:
When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.
La. R.S. 14:69.1 A defines illegal possession of stolen firearms, and states:
Illegal possession of stolen firearms is the intentional possessing, procuring, receiving, or concealing of a firearm which has been the subject of any robbery or theft under circumstances which indicate that the offender knew or should [ 42have known that the firearm was the subject of a robbery or theft.[9]
In State v. Robertson, 386 So.2d 906 (La.1980), the trial court denied the defendant’s motion to quash, rejecting the argument that the principles of double jeopardy barred his prosecution for receiving stolen things in violation of La. R.S. 14:69,[10] where the stolen thing he was charged with receiving (an automobile) was determined to have been one item of property the defendant had been accused of taking from the victim during an armed robbery with which he had been charged in a separate prosecution, and to which charge the defendant had pleaded guilty and been sentenced.
The Court in Robertson framed the issue before it as:
*864 [W]hether a defendant can be prosecuted for receiving stolen things, after having been convicted and sentenced for armed robbery, where the thing received and the object of the theft in the armed robbery are the same.
Id., 386 So.2d at 907.
The Court in Robertson did not apply either the Blockburger “additional fact” test or the “same evidence” test employed by Louisiana courts. Instead, the court’s analysis focused on La.C.Cr.P. art. 482 A, which is contained in Title XIII, Chapter 2, of the Louisiana Code of Criminal Procedure, covering special allegations in indictments and bills of information. La. C.Cr.P. art. 482 A states:
An indictment for theft may also contain a count for receiving stolen things, and the defendant may be convicted of either offense. When two or more persons are jointly indicted for these offenses, any or all of the persons indicted may. be found guilty of either of the offenses charged. The district 14P,attorney shall not be required to elect between the two offenses charged.
The Court in Robertson stated that in enacting La.C.Cr.P. art. 482 A, the legislature was concerned about the double jeopardy dilemma faced by a prosecutor in cases where one could not be certain prior to trial whether the defendant had stolen the goods or had merely received them. On the one hand, if the prosecutor elected to charge the defendant with theft and at trial proved only that the offender received stolen things, double jeopardy would bar his subsequent prosecution for receiving stolen things. Conversely, if the prosecutor charged the defendant with receiving stolen things and proved theft instead, the defendant could not subsequently be charged with theft. Thus, under La. C.Cr.P. art. 482 A, the state can charge both offenses in a single indictment, relieving the prosecutor of electing between the two offenses and leaving it “for the jury to determine which charged is supported by the evidence.” Robertson, 386 So.2d at 908, quoting Official Revision Comment (a) to La.C.Cr.P. art. 482.
Thus, considering the facts presented by Robertson, the Court stated:
For the same reasoning that caused the enactment of art. 482(A), we conclude that where a defendant is charged in separate indictments with theft, or a crime in which theft is an essential element thereof (e. g., armed robbery), and receiving stolen things, and the object of the theft and the thing received are the same, a defendant can be found guilty of either crime but not both. We are supported in this conclusion by the comment to art. 482 which states: “A receiver of stolen things (R.S. 14:69) will be guilty of theft (R.S. 14:67), rather than receiving, if it develops that he procured or in any way participated in the stealing of the goods.” (Emphasis added.) In other words, both charges cannot be supported by the same facts.
In the instant case, since defendant has been convicted of armed robbery, which includes theft as an essential element thereof, he cannot be convicted of receiving stolen things as a matter of law. Hence, the trial judge erred in denying | ^defendant’s motion to quash the information. We must reverse. (Footnote omitted). [Emphasis supplied.]
Id, 386 So.2d at 908.
In State v. Baptiste, 03-2075 (La.App. 4 Cir. 4/28/04), 875 So.2d 833, a case cited by Roe in his appellate brief, this court, citing Robertson, affirmed a Plaquemines Parish trial court’s granting of the defendant’s motion to quash a charge of armed robbery where the property alleged to have been stolen in the armed robbery was the *865 sáme stolen property to which the defendant had previously pleaded guilty to illegally possessing in a St. Charles Parish case.
In State ex rel. Bradley v. State, 08-0346 (La.2/13/09), 1 So.3d 459, and State ex rel. Bradley v. State, 08-0510 (La.2/13/09), 1 So.3d 460, two identical per curiam decisions, the Court, citing both its prior decision in Robertson and this court’s prior decision in Baptiste, held that the defendant’s trial and conviction for armed robbery in the 19th Judicial District Court violated the double jeopardy principle where his prior misdemeanor conviction in the Baker Municipal Court for illegal possession of stolen things involved “the same object of theft” as the armed robbery.
In the present case, however, unlike any facts set forth in Robertson, Baptiste, or Bradley, the bill of information specifically charged that Henley was robbed of' a motor vehicle “and/or” a handgun, “and/or” shirt, “and/or ” pants. [Emphasis supplied.] The state presented ample evidence establishing that Henley was robbed of each of those four items of property— his motor vehicle, his Glock Model 23 firearm, his shirt, and his pants — and that Roe was a principal to that armed robbery.
14r,However, to convict Roe of armed robbery with a firearm, the state did not have to prove that he robbed Henley of that particular firearm or any other firearm, only that he robbed Henley of any one of those four items of property while armed with a firearm. Independent of Roe’s taking of Henley’s Glock Model 23 in the robbery, the state could and did prove Roe guilty of armed robbery with a firearm by showing that he was armed with a firearm (other than Henley’s Glock) when he robbed Henley of all the other three items then in Henley’s possession/immediate control — his vehicle, his shirt, and his pants.
Thus, the facts of the instant case are distinguishable from Robertson, Baptiste, and Bradley.
Applying the Bloclcburger “additional fact” test for double jeopardy, it is clear that, although the armed robbery with a firearm statutes, La. R.S. 14:64 A and 14:64.3 A, and the illegal possession of a stolen firearm statute, La. R.S. 14:69.1 A, have the same “theft” element in common that was present in the armed robbery and receiving (illegal possession of) stolen things cases of Robertson, Baptiste, and Bradley, it is clear that the armed robbery statute and the illegal possession of a stolen firearm statute each requires proof of an additional fact that the other does not. Armed robbery with a firearm requires proof that the “theft” (the taking) be accomplished by the use of force or intimidation, but illegal possession of a stolen firearm does not require proof of any such fact. Illegal possession of a stolen firearm requires proof that the firearm possessed, procured, received, or concealed has been the subject of any robbery or theft under circumstances which indicate that the offender knew or should have known that the firearm was the subject of a robbery or theft; but armed robbery with a firearm requires no proof of such facts |4fi(either the origin of the firearm element or the knowledge element) as to the firearm used in the armed robbery.
As for the “same evidence” test employed by Louisiana courts, which considers the actual physical and testimonial evidence necessary to secure a conviction, not the evidence actually introduced at trial, the evidence “required” to support Roe’s conviction for one crime would not support his conviction for the other crime. Magee, supra; see also State v. Sandifer, 95-2226, p. 5 (La.9/5/96), 679 So.2d 1324, 1329 (“[I]f the evidence required to support a finding of guilt of one crime would also support a *866 conviction for another offense, the defendant can be placed in jeopardy for only one of the two.” [Emphasis in original.]).
Thus, regardless of the fact that the state in the case at bar did present evidence establishing that Roe robbed/effected a taking (theft) of Henley’s Glock firearm during the armed robbery, as alleged in Count 1, given the other evidence establishing that at the same time Roe also effected a taking of Henley’s motor vehicle, his shirt, and his pants, as alternatively alleged in Count 1, we do not find that the evidence that Roe robbed Henley of the firearm was “required to support a finding of guilt” as to Roe’s armed robbery of Henley. The evidence that Roe robbed Henley of his motor vehicle, his shirt, and his pants proved the taking/theft element of the offense of the armed robbery with a firearm count.
La.C.Cr.P. art. 482 A is not offended because, insofar as the evidence “required” or “necessary” to prove Roe’s guilt, the object of the theft in the armed robbery charge in Count 1 and the object of the illegal possession of a stolen firearm charge in Count 4, were not the same.
|47Roe’s convictions in Count 1 and Count 4 do not violate the principle of double jeopardy.[11]
No merit exists to this assignment of error.
X.
ROE — PRO SE ASSIGNMENT OF ERROR NO. 1
In his first pro se assignment of error, Roe argues that the trial court erred in sustaining the state’s objection when his defense counsel sought to question NOPD Officer Wheeler concerning his termination from the NOPD for untrufh-fulness.
Officer Wheeler arrested Roe for possession of a firearm by a convicted felon, that firearm being the Glock Model 23 handgun stolen from Henley during the armed robbery. Early during the state’s direct examination of former Officer Wheeler, he replied in the affirmative when asked whether he had been terminated by the NOPD for untruthfulness in November 2012. Subsequently, during cross examination by counsel for Roe, the following colloquy occurred:
Q When you became a police officer you raise [sic] your hand and take [sic] an oath?
A Yes, I did.
Q And subsequently did you violate that oath?
A The department disciplined me before and there was an investigation where they said I was untruthful.
Q They said you were lying. .
A That’s what they said, yes.
Q You are under oath today. Did you take an oath a few minutes ago?
A Yes, I did.
UQ Are you lying today?
A No.
Subsequently, during cross examination by counsel for Watson, the following colloquy occurred:
Q You were terminated from the NOPD for untruthfulness?
A That’s what I was terminated for, yes.
Q Those charges were sustained; correct?
MR. POCHE:
Judge, objection—
*867 THE COURT:
We have already gone over that and its [sic] repetitive. Its [sic] sustained.
This court set forth the applicable law concerning a defendant’s right to confront and cross examine the witnesses against him in State v. Rubens, 10-1114, p. 44 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 59(quoting State v. Huckabay, 00-1082, p. 25-26 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1108):
An accused is entitled to confront and cross examine the witnesses against him. La. Const, art. 1 [sic], § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross examination of the State’s witnesses. State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202. The trial court has the discretionary power to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473; State v. Robinson, 99-2236, p. 6 (La.App. 4 Cir. 11/29/00), 772 So.2d 966, 971. It has been held that evidentiary rules may not supercede [sic] the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d 1022, 1037. Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in 149the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817.
The trial court sustained the state’s objection to counsel for Watson’s question on the ground that the matter had been covered and it was repetitive. The trial court essentially ruled that further questioning of former Officer Wheeler as to matters already covered was irrelevant because it. ■was repetitive. While Roe appears to suggest that counsel for Watson was prohibited by the trial court from delving into the specific facts of the misconduct that resulted in his termination from the NOPD, the colloquy reflects no questions posed by Watson’s counsel seeking elicitation of those specific facts.
Roe correctly asserts that prior to trial, the state filed a motion in limine to exclude (unspecified) questions and extrinsic evidence pertaining to (unspecified) witnesses’ particular acts, vices, or courses, of conduct which had not resulted in criminal convictions. He asserts that the motion was never heard in open court, but that without resolving the issues, the trial court advised the defense off the record that they could not question former Officer Wheeler as to the circumstances surrounding his termination. However, this court obviously cannot grant Roe any relief based on alleged actions by the trial court that are not reflected/substantiated by the record.
Roe argues that the facts surrounding Officer Wheeler’s termination should have been allowed to be brought before the jury for the purpose of impeaching him. However, neither the trial transcript nor any other transcript or document in the record affirmatively shows that the trial court prohibited defense counsel from questioning Officer Wheeler as to the specific misconduct underlying his admitted | ¡^termination from the NOPD for untruthfulness. Therefore, Roe has failed to show any error by the trial court regarding this issue.
*868 Roe represents that Officer Wheeler’s termination was the result of his providing untruthful information regarding his and several other officers’ use of unauthorized force against an unarmed man. Roe asserts that Officer Wheeler was found to have violated NOPD moral conduct rules both for using unauthorized force and for failing to report the misconduct of his fellow “officer,” and that he “was also in violation of the performance of duty policy.”
However, Roe fails to construct a logical argument as to how questioning Officer Wheeler concerning the specific facts concerning the unauthorized use of force by him and his failure to report what presumably was the same unauthorized use of force by his fellow officer would have served to impeach him any more than he was impeached by his admission three times — in answer to questions by the prosecutor, counsel for Roe, and counsel for Watson — that he had been terminated by the police department for untruthfulness. Officer Wheeler also replied in the affirmative when asked on cross examination: “They said you were lying?”
Assuming for the sake of argument that the trial court did advise the defense off the record prior to trial that it could not question Officer Wheeler as to these facts, we do not find that the trial court would have abused its discretion had it made such a ruling on the ground that the specific facts underlying the former officer’s termination for untruthfulness were irrelevant — that only the fact that he had been terminated for untruthfulness was relevant. While evidentiary rules may not supersede the fundamental right to present a defense, including the right to confront and cross examine witnesses against the defendant, evidence may be excluded if it is irrelevant. See Magee, 11-0574, 103 So.3d 285.
15|We find no merit to this assignment of error.
XI.
ROE — PRO SE ASSIGNMENT OF ERROR NO. 2
In the second of his pro se assignments of error, Roe argues that the trial court erred in refusing to permit his original counsel, Eric Malveau, to withdraw from the case after Mr. Malveau severed his employment with the Orleans Public Defenders (“OPD”) office on 15 February 2012.
A minute entry reflects that Mr. Mal-veau was appointed to represent Roe on 25 July 2011, and he made his first appearance in court as Roe’s counsel on 1 August 2011. At a 9 February 2012 probable cause/motion hearing, Mr. Malveau suggested that the court set a date for a hearing to determine counsel because 15 February 2012 was going to be his last day. The trial court stated that it would not let Mr. Malveau withdraw, noting that he was a good attorney and had been Roe’s counsel from the beginning. At some unknown point after his 15 February 2012 severance from the OPD, Mr. Mal-veau apparently was officially reappointed to represent Roe as private counsel.
A 22 March 2012 minute entry reflects that Mr. Malveau appeared on that date on behalf of Roe for a hearing on motions, which was continued by the defense. A second minute entry dated 22 March 2012 reflects that on that date Mr. Malveau filed a notice of substitution of counsel, a motion for compensation for uncompensated appointment of counsel, and a notice of intent to apply for supervisory writs. The record contains a copy of an undated notice of substitution of counsel filed by Mr. Malveau, requesting that the OPD be substituted as counsel and representing that *869 he “is no longer employed by the OPD’s Conflict Division as |52of February 15, 2012.” The record also contains a copy of an undated motion for compensation of uncompensated appointment of counsel.
The record further contains an undated notice of intent filed by Mr. Malveau to seek supervisory review from this court of what appears to have been a 21 March 2012 ruling by the trial court denying his notice of substitution of counsel. A return date of 26 April 2012 was set. However, Mr. Malveau never filed a writ application in this court under either the case number in the instant case or under his own name.
Mr. Malveau continued to represent Roe, appearing for him on 24 April 2012 for a hearing on motions that was continued on motion of the defense. Mr. Mal-veau appeared with Roe on 24 May 2012 for a motion hearing at which Detective Johnson testified and the trial court found probable cause and denied motions to suppress the evidence and identification. Mr. Malveau appeared with Roe for trial on 26 June 2012, but the trial was continued on defense motion. The next minute entry reflecting an appearance by Mr. Malveau was dated 15 October 2012, at which time the trial court granted his oral motion to withdraw as counsel.
Roe appeared without counsel for a pretrial conference on 19 October 2012, and trial was set for 23 October 2012. Roe next appeared on 23 October 2012 with Donald Donnelly, new counsel. Mr. Don-nelly represented Roe through his 26-28 February 2013 trial and 14 May 2013 sentencing.
Roe argues that the trial court’s action in failing to appoint new counsel deprived him of his right to effective assistance of counsel because after Mr. Malveau’s employment by the OPD ceased, he was without financial or physical means to represent Roe. Mr. Malveau asserted in his motion for compensation for representing Roe that he did not have an office; an investigator; a paralegal; a | ^business telephone, fax or email; legal research services with Lexis or Westlaw; malpractice insurance; a copier, printer, or office supplies; law books; or funds to attend CLEs and other trial practice trainings to stay abreast of the changes in the law. Mr. Malveau asserted in the motion that he was then unemployed and did not yet have the resources to be self-employed. Roe cites these assertions by Mr. Malveau as evidence that he was deprived of his right to effective assistance of counsel.
Roe’s right to assistance of counsel is guaranteed by both the federal and state constitutions. U.S. Const. Amend. VI; La. Const, art. I, § 13.
Roe cites State v. Wigley, 624 So.2d 425 (La.1993), for the proposition that because Mr. Malveau was unemployed and did not have the resources to be self-employed, the court’s reappointment of him to the case was unreasonable, oppressive, and in violation of counsel’s due process rights. However, aside from the fact that Mr. Malveau’s due process right to be compensated does not de facto establish a denial of Roe’s right to effective assistance of counsel, in Wigley the Court reversed the court of appeal’s decision insofar as it held that to require an attorney to defend without fee violates an attorney’s right to substantive due process.
In order to obtain relief via this assignment of error, Roe must establish that Mr. Malveau was ineffective in representing him after Mr. Malveau’s 15 February 2012 severance from the OPD and his reappointment as his counsel.
This court set forth the applicable jurisprudence on ineffective assistance of counsel in State v. Rubens, 10-1114, pp. 58-59 *870 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67, as follows:
| m“As a general rule, claims of ineffective assistance of counsel are more properly raised by application for postconviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.” State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel’s performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
The record does not establish that Mr. Malveau’s representation of Roe was deficient from 16 February 2012 to 15 October 2012. Therefore, the issue of whether Roe was prejudiced is mooted. Roe fails to establish that he received ineffective assistance of counsel rendered by Mr. Malveau.
Roe also argues that Mr. Donnelly, who succeeded Mr. Malveau, inherited a case in which “no investigation into different lines of defense had been done.” Thus, he asserts, Mr. Donnelly had only four months to procure the services of private investigators and expert witnesses, “which forced him to go to trial without the necessary investigatory and expert assistance.” Roe argues that this prejudiced | mMr. Donnelly’s ability to present an adequate defense, asserting that Mr. Donnelly’s failure to call any witnesses on his behalf demonstrated his lack of preparation due to his inability to perform an adequate investigation into different lines of defense in a short period.
Roe cites State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213, relative to a court ordering the state to fund expert assistance to an indigent defendant. In Touchet, the Court cited State v. Craig, 93-2515, c/w State v. Harris, 93-2589 (La.5/23/94), 637 So.2d 437, where it upheld a trial court ruling ordering payment for the services of an investigator, a psychologist, and a mitigation expert; State v. Carmouche, 527 So.2d 307 (La.1988), where it ordered the trial court to grant the defendant’s request for experts in fingerprint analysis and serology; and State v. Madison, 345 So.2d 485 (La.1977), where it noted that expert investigative assistance might be critical to an indigent’s defense. Touchet, p. 4, 642 So.2d at 1215.
However, the Court in Touchet also noted that in Craig, it had stated that *871 after an indigent defendant makes a threshold showing as to a need for expert assistance, such assistance should be provided to him at governmental expense. In Touchet, the Court stated that it was amplifying that rule set forth in Craig, and it set forth the following rule that still governs today:[12]
|fifiHenceforth, for an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution’s case or to support a critical element of the defense. If the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.
Touchet, p. 6, 642 So.2d at 1216.
The record does not reflect that at any point Mr. Malveau (either prior to or subsequent to 15 February 2012 and 15 October 2012), or Mr. Donnelly sought to have the court provide payment for the services of a private investigator or any type of expert — or that either counsel could have justified such a request under Touchet.
Roe fails to establish that he received ineffective assistance of counsel as a result of the trial court’s initial refusal to permit Mr. Malveau to withdraw. He has failed to establish that his defense was prejudiced as a result of the trial court’s ruling.
No merit exists to this assignment of error.
XII.

CONCLUSION

For the foregoing reasons, (a) the respective convictions of Joshua A. Watson and Jason M. Roe in Count 1 are affirmed, but their respective sentences are vacated and the case remanded for sentencing in accordance with La. R.S. 14:64 and the mandate of La. R.S. 14:64.3 A; (b) Roe’s convictions as to Counts 3 and 4 and his sentence as to Count 4 are affirmed, but that the case is remanded to |OTthe trial court for imposition of the mandatory fine provided for by La. R.S. 14:95.1 B as to Count 3; and (c) Roe’s conviction as to Count 2 is reversed.
AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; REMANDED.

. Trial was held on 26-28 February 2013.

. Elzy’s last name is spelled "Elzy” in the bill of information but “Elsey" in the trial transcript.

. La. R.S. 14:64.3 A states:
A. When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.

. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. La.C.Cr.P. art. 493 states:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

. The jury already knew Watson was in federal custody in a halfway house for a prior conviction.

. La.C.Cr.P. art. 921 states: "A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.”

. La.C.Cr.P. art. 591 states:
No person shall be twice put in jeopardy of life or liberty for the same offense, except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with the express consent of the defendant.

. La. R.S. 14:69.1 was added by La. Acts 2000, 1st Ex. Sess., No. 116, § 1, essentially tracking La. R.S. 14:69, illegal possession of stolen things.

. La. R.S. 14:69 was amended by La. Acts 1982, No. 552, § 1, to change the name of the offense to "illegal possession of stolen things,” defined in pertinent part, as "the intentional possessing, procuring, receiving, or concealing of.... ”

. See also State v. Magee, 12-1084 (La.8/25/14), 146 So.3d 193; State v. Powe, 14-0137 (La.App. 4 Cir. 7/16/14), 145 So.3d 583.

. See State v. Frank, 99-0553, p. 6 (La.5/22/07), 957 So.2d 724, 730 ("In considering this issue, we noted that in State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213, this court addressed the specific issue of the showing an indigent needs to make to obtain state-funded expert assistance as follows:. ...").